**HEARTLAND SURGICAL SPECIALTY HOSPITAL, LLC, Plaintiff,**

v.

**MIDWEST DIVISION, INC. d/b/a HCA Midwest Division, et al., Defendants.**

**Civil Action No. 05–2164–MLB.**

United States District Court, D. Kansas.

Oct. 1, 2007.

Eric L. Dirks, Norman E. Siegel, Pat-
rick J. Stueve, Rachel E. Schwartz, Todd

M. McGuire, Virginia Stevens Crimmins, Stueve Siegel Hanson LLP, Kansas City, MO, for Plaintiff.

Brian E. Kowalski, Eric J. McCarthy, Margaret M.L. Zwisler, Marguerite M. Sullivan, Latham & Watkins, Washington, DC, David E. Everson, Jr., R. Kent Sullivan, Russell J. Keller, Stinson Morrison Hecker LLP, Jeffrey J. Simon, Leonard L. Wagner, M. Jared Marsh, Michael S. Hargens, William A. Lynch, Husch & Eppenberger, LLC, Floyd R. Finch, Jr., Laura K. Brooks, Shelley A. Runion, Blackwell Sanders LLP, John D. Seaton, Lewis, Rice & Fingersh, LC, John M. McFarland, Scott E. Harvison, Kutak Rock LLP,

David A. Jermann, II, Edward R. Spalty, Gerald A. King, Armstrong Teasdale LLP, Kansas City, MO, Allen Spencer Boston, David B. Helms, Richard B. Walsh, Jr., Winthrop B. Reed, III, Lewis, Rice & Fingersh, LC, St. Louis, MO, David A. Ettinger, Peter E. Boivin, Honigman Miller Schwartz & Cohn, Detroit, MI, Harry Christopher Goplerud, Honigman Miller Schwartz Dand Cohn LLP, Tampa, FL, Lara Fetsco Phillip, Honigman Miller Schwartz and Cohn LLP, Bloomfield Hills, MI, for Defendants.

## MEMORANDUM AND ORDER

MONTI L. BELOT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................1263

II. PROCEDURAL HISTORY .......................................1263

III. FACTS ......................................................1264
 A. The Healthcare Industry ................................1265
 B. Heartland .............................................1266
 C. The Individual Defendants ..............................1267
 1. Aetna ...........................................1267
 2. Coventry ........................................1267
 3. Blue Cross ......................................1267
 4. United ..........................................1267
 5. Cigna ...........................................1268
 6. Humana .........................................1268
 7. HCA Midwest ....................................1268
 8. Saint Luke's ....................................1268
 9. Shawnee Mission Medical Center ..................1268
 10. North Kansas City Hospital ......................1268
 11. Carondelet ......................................1268
 D. Contractual Relationships Between the Defendants ........1268
 1. Aetna's Relationships ............................1268
 a. Aetna—HCA Midwest .......................1268
 b. Aetna—Saint Luke's ......................1270
 c. Aetna—Shawnee Mission Medical Center ......1270
 d. Aetna—North Kansas City Hospital ...........1270
 e. Aetna—Carondelet ........................1270
 2. Coventry's Relationships .........................1271
 a. Coventry—HCA Midwest ....................1271
 b. Coventry—Saint Luke's ...................1272
 c. Coventry—Shawnee Mission Medical Center ...1273
 d. Coventry—North Kansas City Hospital ........1274
 e. Coventry—Carondelet .....................1274
 3. Blue Cross's Relationships .......................1274
 a. Blue Cross—HCA Midwest ..................1274
 b. Blue Cross—Saint Luke's .................1275
 c. Blue Cross—Shawnee Mission Medical Center ..1275

 d. Blue Cross—North Kansas City Hospital ........................1275 
 e. Blue Cross—Carondelet .........................................1275 
 4. United's Relationships................................1275 
 a. United—HCA Midwest.........................................1275 
 b. United—Saint Luke's ..........................................1275 
 c. United—Shawnee Mission Medical Center .......................1275 
 d. United—North Kansas City Hospital .............................1275 
 e. United—Carondelet...........................................1276 
 5. Cigna's Relationships ..............................1276 
 a. Cigna—HCA Midwest.........................................1276 
 b. Cigna—Saint Luke's ..........................................1276 
 c. Cigna—Shawnee Mission Medical Center .......................1276 
 d. Cigna—North Kansas City Hospital.............................1276 
 e. Cigna—Carondelet ...........................................1276 
 6. Humana's Relationships ..............................1276 
 a. Humana—HCA Midwest ......................................1276 
 b. Humana—Saint Luke's ........................................1277 
 c. Humana—Shawnee Mission Medical Center .....................1277 
 d. Humana—North Kansas City Hospital ..........................1277 
 e. Humana–Carondelet .........................................1277 
 E. Heartland's Attempts to Obtain MCO Contracts .........................1277 
 1. Aetna ..............................................1277 
 2. Coventry .....................................................1278 
 3. Blue Cross....................................................1280 
 4. United, Cigna, and Humana ....................................1280 
 F. Defendants' Internal Expressions Concerning Specialty Hospitals...........1280 
 1. MCO Defendants .............................................1280 
 2. Hospital Defendants ..........................................1281 
 a. HCA Midwest...............................................1281 
 b. Saint Luke's ................................................1282 
 c. Shawnee Mission Medical Center .............................1282 
 d. Carondelet.................................................1283 
 G. Communications Between and Amongst Defendants .......................1283 
 H. Common Group Associations of Defendants .............................1288 
 1. Classic Cup Dinners .........................................1288 
 2. Ingram's Magazine Meeting....................................1289 
 3. HFMA Meeting ..............................................1289 
 I. Motion to Strike ...................................................1290 

IV. GENERAL SUMMARY JUDGMENT STANDARDS .........................1292 

V. ANALYSIS .............................................................1292 
 A. Sherman Act, 15 U.S.C. § 1 ..........................................1292 
 1. Heartland's Styling of its § 1 Claim ..............................1292 
 2. Standards of Law and Summary Judgment on a § 1 Claim ............1295 
 3. Analysis of Heartland's § 1 Claim................................1298 
 a. Direct Evidence .............................................1298 
 b. Economic Motive ............................................1302 
 c. Circumstantial Evidence .....................................1303 
 4. Individual Defendants' Participation..............................1309 
 a. Aetna's Participation ........................................1309 
 b. Coventry's Participation .....................................1313 
 c. HCA Midwest's Participation..................................1315 
 d. Saint Luke's Participation ...................................1317 
 e. Shawnee Mission Medical Center's Participation ................1319 
 f. Carondelet's Participation ...................................1320 
 5. Conclusion—Sherman Act ........................................1321 
 B. Tortious Interference with a Prospective Business Relationship.............1322 
 C. Civil Conspiracy ...................................................1325

VI. CONCLUSION .................................................... 1325

## I. INTRODUCTION

This matter comes before the court on defendants Aetna Health Inc. and Aetna Life Insurance Company's (collectively "Aetna's") motion for summary judgment (Docs. 777, 778); defendants Coventry Health Care of Kansas, Inc., Coventry Health and Life Insurance Company, and SouthCare PPO, Inc.'s (collectively "Coventry's") motion for summary judgment (Docs. 848, 852); and defendants Midwest Division, Inc. d/b/a HCA Midwest Division ("HCA Midwest"), Saint Luke's Health System, Inc. ("Saint Luke's"), Carondelet Health, St. Joseph Medical Center, St. Mary's Medical Center (collectively "Carondelet"), and Shawnee Mission Medical Center, Inc.'s ("Shawnee Mission Medical Center's") joint motion for partial summary judgment (Docs. 834, 835).

The motions have been fully briefed [1] (Docs. 833, 899, 901, 920, 921) and the court held oral argument on the motions on September 27, 2007.

The motions for summary judgment (Docs. 777, 834, 848) are GRANTED in part and DENIED in part for the reasons stated more fully herein.

## II. PROCEDURAL HISTORY

Plaintiff Heartland Surgical Specialty Hospital, LLC ("Heartland") filed suit in April 2005 alleging antitrust, tortious in-terference with prospective business relationships, and civil conspiracy claims. (Doc. 1.) After several amendments, Heartland's complaint named eighteen defendants, grouped into eleven defendant groups [2] and entities. (Doc. 249.)

Characterizing the pursuit of this litigation as contentious is, at best, an understatement. The parties' discovery has spanned more than two years and necessitated more than two dozen discovery orders from the magistrate judge assigned to this case. Beginning in January 2007 and continuing through March 2007, however, Heartland settled its claims against five groups of defendants, which were then dismissed from this litigation: United Healthcare of the Midwest, Inc. and United Healthcare Insurance Co. (collectively "United") (*see* Docs. 439, 491); Cigna Healthcare of Ohio, Inc. d/b/a Cigna Healthcare of Kansas/Missouri ("Cigna") (*see* Docs. 553, 557); Blue Cross and Blue Shield of Kansas City ("Blue Cross") (*see* Docs. 558, 562); Humana Health Plan Inc. and Humana Insurance Company (collectively "Humana") (*see* Docs. 559, 563); [3] and Board of Trustees of the North Kansas City Hospital ("North Kansas City Hospital") (*see* Docs. 582, 586).[4]

After these settlements and dismissals, two MCO Defendant groups and four Hospital Defendants remain. These defendants have filed the motions for summary

---

1. All pleadings and exhibits related to these dispositive motions have been filed under seal, pursuant to a procedure previously outlined by this court. (*See* Doc. 783 at 5.) The parties are directed to the court's conclusion, *infra* page 124, for the court's direction concerning the continued provision of these documents under seal.

2. The defendants were grouped by corporate association, *e.g.,* Aetna Health Inc. was grouped with Aetna Life Insurance Company.

3. Collectively, Aetna, Coventry, United, Cigna, Blue Cross, and Humana will be referred to as the "MCO Defendants." MCO is an acronym for Managed Care Organization. This term, and those related to it, will be discussed in more detail below.

4. Collectively, HCA Midwest, Saint Luke's, Shawnee Mission Medical Center, Carondelet, and North Kansas City Hospital will be referred to as the "Hospital Defendants."

judgment that are now under consideration by this court.

Heartland alleges three claims against the MCO Defendants. These claims are: 1) · Count II—conspiracy to boycott, brought pursuant to the Sherman Act, 15 U.S.C. § 1; 2) Count IV—tortious interference with a prospective business relationship; and 3) Count V—civil conspiracy. (Doc. 249.) Aetna and Coventry move for summary judgment on all claims against them.

Heartland alleges three claims against the Hospital Defendants. These claims are: 1) Counts I and II—conspiracy to boycott, brought pursuant to the Sherman Act, 15 U.S.C. § 1; 2) Count III—tortious interference with a prospective business relationship; and 3) Count V—civil conspiracy. (Doc. 249.) The Hospital Defendants move for summary judgment on Count I, alleging a horizontal conspiracy amongst the Hospital Defendants, and that portion of Count II alleging a horizontal conspiracy amongst the Hospital Defendants. (Doc. 834.)

## III. FACTS

Although not directly pertinent to the matters raised by the motions *sub judice,* this case ultimately involves the proper place of physician-owned healthcare ventures in the broad landscape of United States healthcare. Both sides insist they solely possess the moral high ground. Heartland contends that physician ownership yields higher quality care at a lower cost; that physician-owned facilities are better able to react to new ideas and patient needs; and that patients appreciate the convenience of smaller facilities with increased nursing care and patient amenities. Defendants contend that physician-owned healthcare ventures "cherry-pick" the best patients, leaving traditional hospitals with costly obligations such as emergency and uninsured care; that physician-owned healthcare ventures increase the overall cost of healthcare; and that physician-owned facilities are unable to respond to the emergent situations of their patients in the same manner as a general hospital. Neither side can make a colorable argument that the parties' profits is not a central factor in their dispute.

The healthcare industry is made up of many players: both governmental and private industry, both for-profit and not-for-profit healthcare providers, both employer-based and individually acquired insurance. The players central to this dispute are the insurer MCOs, the healthcare providers (both traditional general hospitals and so-called niche providers, such as physician-owned ventures), and the insureds (the healthcare patient). An MCO is simply a healthcare financing entity, organized to provide lower cost healthcare through contracts with healthcare providers. MCOs differ from traditional indemnity healthcare insurance in that MCOs do not pay healthcare providers on a "fee-for-service" basis and limit the providers an insured may see.

An MCO may offer several types of managed care plans, included among these are Preferred Provider Organizations ("PPOs"), Health Maintenance Organizations ("HMOs"), and Point of Service ("POS") plans.[5] In a PPO, a limited number of healthcare providers contract to perform healthcare services to a defined

---

**5.** As stated in *Reazin v. Blue Cross & Blue Shield of Kan., Inc.,* 899 F.2d 951, 956–57 n. 5 (10th Cir.1990): "HMOs and PPOs are prospective reimbursement arrangements, in which a member or subscriber pays a monthly amount to medical care providers who then oversee all the health care needs of the member. In an HMO or PPO, the member typically pays less for health care coverage than under a traditional indemnity insurance plan, but is limited in his or her choice of medical care providers."

group of insureds on a discounted basis. The insureds are not required to use the preferred providers, but if they do, they pay lower out-of-pocket expenses. An HMO is more restrictive than a PPO because, in an HMO, the HMO provides a fixed list of insureds to a primary care provider and the insureds must receive their care from that provider. A POS plan is a type of HMO that requires use of a "gatekeeper" physician for referrals.

Niche providers include: ambulatory surgery centers performing outpatient procedures not requiring overnight hospital stays; freestanding imaging or laboratory facilities; and specialty hospitals providing a limited range of specialty procedures, often organized around a singular issue, such as surgery, cardiac care, or women's care. Niche facilities may be wholly owned by physicians, wholly owned by traditional general hospitals, or owned in part by each. The insureds can obtain their healthcare from any of the niche providers or the traditional general hospitals; however, insureds are more likely to choose a healthcare provider covered by their MCO's networks so as to avoid penalties for using an out-of-network provider. Because of these MCO networks, and the agreements between the MCO and the insureds, a healthcare provider must be an in-network provider in order to receive an appreciable volume of patients.

MCOs sell their products to employers and compete with other MCOs for employer accounts. It is the employers that provide the insureds to an MCO's plan. An employer has the incentive to choose MCOs that offer the largest networks of providers (*i.e.*, the highest number of providers for the insureds to choose from) for the lowest cost. As a result, MCOs have an incentive to increase the number of healthcare providers with which they contract, while decreasing the amount of reimbursement they pay to those providers in order to keep their cost to employers for purchasing their plans as low as possible.

Because of the limited nature of defendants' dispositive motions, the facts detailed below are limited to the issues raised, and the necessary contextual background. Facts set forth are either uncontroverted, or, if controverted, taken in the light most favorable, along with all favorable inferences, to Heartland. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir.2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Additional facts are taken from defendants' answers to Heartland's Third Amended Complaint (Doc. 249).

## A. The Healthcare Industry

In healthcare, the premise of selective contracting is to deliver volume to a healthcare provider in exchange for better reimbursement rates from the MCO. (Doc. 778 ¶ 5.) Narrow networks drive volume to an entity. (Doc. 835 ¶ 23.) Network configuration clauses which trade price for volume are common in the healthcare industry nationwide. (Doc. 778 ¶ 10.) Some network configurations establish a framework with a rate bump or rate trigger and/or renegotiation for additions to the network. (Doc. 835 ¶ 2.) MCO contracts with healthcare entities that confer in-network status mean that the provider has a participating provider agreement with the managed care plan. (Doc. 835 ¶ 1.)

Heartland's expert, George Hay,[6] opines that agreements specifically designed and

---

**6.** Some of the defendants dispute Heartland's use of Hay's expert report on the basis that an expert "cannot testify as to facts." (*See, e.g.,* Docs. 901 at 5; 921 at 12; 920 at 6.) Defendants, however, cite Hay's testimony in support of their own alleged facts (*see, e.g.,* Docs. 901 at 5; 921 at 1 n. 3, 6, 17–18; 920 at 15) and do not, at this point, offer any legal

implemented to exclude physician-owned specialty hospitals, while at the same time permitting competing hospitals to add new facilities, are not typical industry discount-for-volume contracts; that such an arrangement would be risky without some assurance or understanding that other hospitals would reciprocate; and that without a commitment or assurance from all MCOs to exclude Heartland and other physician-owned specialty hospitals, a decision to do so by a single MCO acting unilaterally might result in another MCO having a more attractive network of facilities to sell to employers. (Doc. 833 ¶ 36.) The MCO Defendants admit that they compete aggressively with each other for business. (Docs. 778 ¶ 34; 852 1 48.) HCA Midwest and Saint Luke's were concerned that if one MCO Defendant contracted with Heartland, other MCO Defendants would follow suit. (Docs. 833 ¶ 22; 833 ¶ 56; 899 ¶ 56.)

The MCO Defendants account for approximately ninety percent of the managed care enrollment in the Kansas City metropolitan area.[7] (Doc. 833 ¶ 4.) The Hospital Defendants' combined share of net patient revenues in the Kansas City metropolitan area is seventy-four percent.[8] (Doc. 833 ¶ 2.) Heartland's expert opines that Heartland competes directly with the Hospital Defendants for hospital-based inpatient and outpatient acute care services in the Kansas City metropolitan area. (Doc. 833 ¶ 3.) Hay also opines that it would be difficult for any MCO Defendant to build a competitive network without HCA Midwest and Saint Luke's, and any attempt to construct a network without any of the Hospital Defendants would result in a network that had insufficient distribution of hospitals throughout the relevant geographic area. (Doc. 833 ¶ 5.) For example: Humana considered HCA Midwest to be critical to its network (Doc. 833 ¶ 5); in 2005, Coventry considered HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to be significant partners to its networks (Doc. 833 ¶ 5); Blue Cross considers HCA Midwest and Saint Luke's to be very important components of its networks (Doc. 833 ¶ 5) and it is important to Blue Cross to offer consumers hospital choices similar to those offered by its competitors. (Doc. 833 ¶ 6.)

## B. Heartland

Heartland incorporated on October 18, 2001[9] (Doc. 778 ¶ 14), and opened for business on September 18, 2003, in Johnson County, Kansas (Doc. 833 ¶ 1). Heartland is owned by physicians specializing in orthopaedic, neurological, plastic, pain management, and general surgery disciplines. (Doc. 833 ¶ 1.)

Heartland has forty-eight licensed inpatient beds and can accommodate inpatient

argument for the exclusion of Hay's opinion testimony on any other basis.

7. Blue Cross is by far the largest MCO in the Kansas City area with forty-two percent share of enrollees. United is the second largest (18%), Coventry is the third largest (11%), Aetna is the fourth largest (8%), Humana is the sixth largest (5%), and Cigna is the eighth largest (2%). (Doc. 833 ¶ 4.)

8. HCA Midwest is by far the largest hospital system in the Kansas City metropolitan area with twenty-eight percent share of the market. Saint Luke's is the second largest (16%),

North Kansas City Hospital is the fourth largest (11%), Shawnee Mission Medical Center is the fifth largest (10%), and Carondelet is the seventh largest (8%). (Doc. 833 ¶ 2.)

9. Kansas is not a "Certificate of Need" state, which means that anyone who wants to build a new hospital may do so without first obtaining a determination from the State that there is a need for the hospital. (Doc. 852 ¶ 29.) In addition, Kansas does not have an "any willing provider" law that requires MCOs to offer contracts to all providers. (Doc. 778 ¶ 13.)

and outpatient surgery. (Docs. 833 ¶ 1; 901 ¶ 1.) Heartland represented itself as a specialty hospital, with nineteen private rooms, focused on spine and upper extremity treatment, with additional supporting specialties. (Doc. 778 ¶ 22.) Heartland advertised that it offered a higher standard of care with lower costs, lower-than-average infection rates, and higher-than-average nurse to patient ratios and patient satisfaction. (Doc. 833 ¶ 1.) Heartland also advertised that it offered capabilities not offered anywhere else in Kansas City. (Doc. 833 ¶ 1.)

Heartland filed suit on April 26, 2005, with the goal of obtaining MCO contracts. (Doc. 778 ¶ 33.)

## C. The Individual Defendants[10]

### 1. Aetna

In the Kansas City metropolitan area, Aetna Health Inc. and Aetna Life Insurance Company are the operating entities for the provision of managed care plans under the Aetna brand name. (Doc. 778 ¶ 1.) Aetna competes aggressively with MCO Defendants for members and employer accounts. (Doc. 778 ¶ 34.)

### 2. Coventry

Defendants Coventry Health Care of Kansas, Inc., Coventry Health and Life Insurance Company, and SouthCare PPO, Inc., are all subsidiaries of the parent company, Coventry Health Care, Inc. ("CHC, Inc."). (Doc. 852 ¶ 1.) Coventry Health Care of Kansas, Inc. and Coventry Health

and Life Insurance Company offer managed care plans in the Kansas City metropolitan area. (Docs. 852 ¶ 2; 852 ¶ 3.) SouthCare PPO, Inc. rents managed care networks to third parties so that they may utilize Coventry's network of providers. (Doc. 852 ¶ 4.) Coventry aggressively competes with the MCO Defendants for members and employer accounts in the Kansas City metropolitan area. (Doc. 852 ¶ 48.)

In early to mid–2002, in order to increase its covered lives in the Kansas City area, CHC, Inc. began negotiations [11] to acquire and merge with a Kansas City-based MCO, Mid–America Health Partners, Inc. ("HealthNet"). HealthNet was owned by several local hospitals, including Saint Luke's, Shawnee Mission Medical Center, Carondelet, and New Liberty Hospital. (Docs. 852 ¶ 5; 835 ¶ 9.) On or about September 14, 2002, the shareholders of HealthNet entered into an agreement and plan of merger that resulted in the sale of HealthNet to Coventry. (Doc. 835 ¶ 9.) HealthNet's managed care network was then merged into Coventry's network. (Doc. 835 ¶ 9.) This transaction will be discussed in conjunction with the parties' managed care contracts below.

### 3. Blue Cross

Blue Cross offers a variety of managed care plans (Docs. 249 ¶ 14; 269 ¶ 14) in the Kansas City area.

### 4. United

United operates managed care plans in the Kansas City area. (Docs. 249 ¶ 16; 274 ¶ 16.)

---

**10.** In this section, and elsewhere within the factual recitation, the court includes those defendants which have been dismissed from this litigation. The court does this for the limited purpose of providing the relevant background information concerning the Kansas City metropolitan healthcare industry and makes no finding with respect to those defendants' liability as co-conspirators.

**11.** The court often uses the corporate entity's name as the actor in negotiations or other actions, without identifying the name of the specific person who was involved or who made the statement attributed to the corporate entity. This is done in order to simplify the record for ease of reading. The parties also engage in this practice at times.

### 5. Cigna

Cigna offers a variety of managed care plans in the Kansas City area. (Docs. 249 f 19; 270 f 19)

### 6. Humana

Humana is an HMO that does business in the Kansas City area. (Docs. 249 ¶ 17; 277 ¶ 8.)

### 7. HCA Midwest

HCA Midwest is a wholly owned subsidiary of HCA Inc. There are twelve HCA Midwest acute care hospitals in and around the Kansas City metropolitan area. (Docs. 249 ¶ 8; 271 ¶ 8.)

### 8. Saint Luke's

Since at least as early as November 2000 through October 2002, Saint Luke's and Shawnee Mission Medical Center were affiliated. During this affiliation, a separate joint operating company, Saint Luke's/Shawnee Mission Health System, acted as the parent company for Saint Luke's and Shawnee Mission Medical Center's combined healthcare business operations. (Doc. 835 ¶ 21.)

Saint Luke's operates an integrated health care delivery system which is comprised of three hospitals in the Kansas City area.[12] (Docs. 249 ¶ 9; 267 ¶ 9.) Saint Luke's hospitals in the Kansas City area are medical providers in certain health plans offered by MCOs, including Coventry, United, Aetna, CIGNA, and Blue

Cross. Not every Saint Luke's hospital is a participant in each health network. (Doc. 835 ¶ 22.)

### 9. Shawnee Mission Medical Center

Shawnee Mission Medical Center is an affiliated organization of Adventist Health System and operates an acute care facility in the Kansas City area. (Docs. 249 ¶ 11; 272 ¶ 11.)

### 10. North Kansas City Hospital

North Kansas City Hospital is a state authorized facility organized under a Missouri statute. It is a community hospital facility operated by the Board of Trustees of the City of North Kansas City. (Docs. 249 ¶ 12; 268 ¶ 12.)

### 11. Carondelet

Carondelet Health is a religious, mission-based, non-profit hospital network, comprised of two full-service community member hospitals which offer both inpatient and outpatient services: St. Joseph, located in Kansas City, Missouri, and St. Mary's, located in Blue Springs, Missouri. (Doc. 835 ¶ 3.)

### D. Contractual Relationships Between the Defendants[13]

### 1. Aetna's Relationships

### a. Aetna—HCA Midwest

In 1999, Aetna had a small, selective network which lacked the two largest hos-

---

12. Saint Luke's, in its motion for summary judgment, refers to its "four hospitals in the Kansas City area" (Doc. 835 1 22), rather than the three hospitals contemplated by Heartland's Third Amended Complaint and Saint Luke's answer thereto. This discrepancy is irrelevant to the court's analysis.

13. This subsection, discussing the parties' contractual relationships concerning provider agreements, is admittedly incomplete. In some portions, the parties failed to address whether the parties had a provider agreement at all, and the court so notes. In other portions, the parties establish that a provider agreement exists between the parties, but fail to identify the appropriate time frame, or whether network configuration language is included in the agreement. The court presents the information it has been provided, and notes that the provider agreements that are discussed are simply the ones discussed at length by the parties.

pital systems: HCA Midwest and Saint Luke's. Aetna was negotiating to add HCA Midwest to its network when Aetna acquired the healthcare business from The Prudential Insurance Company of America ("Prudential") in 1999. Prudential had historically contracted with HCA Midwest, but not Saint Luke's. (Doc. 778 ¶ 2.)

As part of the acquisition, Aetna succeeded to a one-year agreement with HCA Midwest effective September 1, 1999 (the "Prudential Agreement"). The Prudential Agreement contained a network configuration clause providing, in pertinent part, that in Jackson County, Missouri and Johnson County, Kansas, Prudential would "not modify its current hospital network of Participating Health Care Providers which provide Covered Services which are also provided by [HCA Midwest] ... without the prior written notice to [HCA Midwest]." (Docs. 778 ¶ 3; 835 ¶ 44.) Either party could terminate the Prudential Agreement after the initial one-year term, upon written notice to the other party at least one hundred eighty days in advance of the termination date. (Doc. 778 ¶ 4.)

Aetna had to ensure that it would have networks similar to those of Prudential so that Aetna could successfully move approximately 90,000 Prudential members to Aetna. If Aetna could not keep a provider agreement with HCA Midwest, then Aetna potentially could have lost all of the Prudential members. Aetna negotiated with HCA Midwest for a longer term, five-year provider agreement. (Doc. 778 ¶ 4.)

On December 2, 1999, Aetna entered into a managed care agreement with HCA Midwest which replaced the Prudential Agreement. The 1999 Aetna–HCA Midwest Agreement was effective for an initial term of five years starting on January 1, 2000, with an automatic renewal for additional terms of one year each, unless and until terminated. Neither party could terminate the 1999 Aetna–HCA Midwest pro-

vider agreement during the initial five-year term. (Doc. 778 ¶ 7.) After the initial five-year term, the 1999 Aetna–HCA Midwest provider agreement could be terminated by either party, without cause, at any time upon at least one hundred eighty days prior written notice. (Doc. 778 ¶ 8.) The 1999 Aetna–HCA Midwest provider agreement—with its network configuration clause—was still in effect in July 2003. (Doc. 778 ¶ 12.)

The 1999 Aetna–HCA Midwest provider agreement ensured Aetna significantly discounted reimbursement rates, which helped Aetna to be competitive in selling its insurance products to employer groups and in keeping premiums to Aetna members lower. (Doc. 778 ¶ 7.) The HCA Midwest deal was significant for Aetna. Aetna avoided potentially losing the Prudential members and the deal grew Aetna's network. (Doc. 778 ¶ 11.)

Because Aetna and HCA Midwest contemplated a five-year "no-out" agreement, Aetna felt it was important that both parties understood exactly what would happen if Aetna added providers to its network during the term. (Doc. 778 ¶ 6.) The 1999 Aetna–HCA Midwest provider agreement had a network configuration clause that provided, in pertinent part, that if Aetna exercised its right to add a hospital to its network in Jackson County, Missouri or Johnson County, Kansas, then Aetna would pay HCA Midwest increased rates: ten percent if one hospital was added, twenty percent if two hospitals were added, and thirty percent if three hospitals were added. (Docs. 778 ¶ 9; 778 ¶ 6; 835 ¶ 44.) By having preferred providers, Aetna receives better reimbursement rates in exchange for larger involvement of Aetna's members with that preferred provider. Aetna was able to negotiate lower reimbursement rates with HCA Midwest by having a selective network. (Doc. 778 ¶ 5.)

HCA Midwest and Aetna amended their contract in September 2004 to provide that, if Aetna chose to expand its network to include specialty hospitals and free-standing ambulatory surgery centers that are not majority owned by participating hospitals, Aetna must first obtain HCA Midwest's consent. (Doc. 835 ¶ 45.) Aetna argued against the inclusion of a network configuration clause in the 2004 Aetna–HCA Midwest amendment. (Doc. 833 ¶ 7.)

During negotiation of the 2004 Aetna–HCA Midwest amendment, HCA Midwest informed Aetna that it would not participate in any MCO network that included a specialty hospital and that HCA Midwest did not intend to agree to addition of any specialty hospital. (Doc. 833 ¶ 18.) In a draft of the 2004 Aetna–HCA Midwest amendment, Aetna proposed language to HCA Midwest that if HCA Midwest did not have the same or substantially similar network configuration clause in all its major payor agreements, or did not enforce such a provision, then Aetna could request, and HCA Midwest would be required to either bring the payor into compliance or release Aetna from its network configuration obligation. Aetna considered those other "major payors" to be Blue Cross, Cigna, Coventry, and Humana. The proposal was not included in the parties' amendment. (Doc. 833 i 19.)

#### b. Aetna—Saint Luke's

Throughout 2003, Aetna saw a strong network need to add Saint Luke's to its network. (Doc. 778 ¶ 41.) Aetna's network head had received requests to add Saint Luke's to the Aetna network. (Doc. 778 ¶ 41.) Aetna negotiated with Saint Luke's and reached an agreement on January 27, 2004 to add Saint Luke's effective March 1, 2004. (Docs. 778 ¶ 41; 835 ¶ 24.) The 2004 Aetna–Saint Luke's provider agreement provides that it is not exclusive and that it is the "complete and sole contract" between Aetna and Saint Luke's. (Doc. 835 ¶ 24.)

On January 29, 2004, Aetna notified HCA Midwest of the addition of Saint Luke's hospitals to its network in Johnson and Jackson Counties and increased HCA Midwest's reimbursement rate by twenty percent, in accordance with the network configuration clause of the 1999 Aetna–HCA Midwest provider agreement. (Doc. 778 ¶ 42.) Aetna estimated the twenty percent rate increase to HCA Midwest, as a result of adding Saint Luke's, would cost it three million dollars annually. Aetna made this business decision because of the market need and opportunity to grow Aetna's network. (Doc. 778 ¶ 43.)

#### c. Aetna—Shawnee Mission Medical Center

Since at least November 2000 to the present, Aetna has not had a contract with Shawnee Mission Medical Center. (Docs. 835 ¶ 41; 778 ¶ 39.) Aetna has identified a market need for Shawnee Mission Medical Center, but has been unable to negotiate an agreement with it. (Doc. 778 ¶ 44.)

#### d. Aetna—North Kansas City Hospital

Aetna's provider agreement with North Kansas City Hospital dates to August 1, 1997 (Doc. 778 SI 37), and does not contain a network configuration clause (Docs. 835 ¶ 20; 778 ¶ 40).

#### e. Aetna—Carondelet

Aetna's provider agreement with Carondelet dates to June 1, 1998 (Doc. 778 ¶ 37) and does not contain a network configuration clause (Doc. 778 *f* 40). While negotiating its 2005 contracts with Aetna, Carondelet attempted to negotiate network configuration language but the network configuration language was not included in

the parties' provider agreement. (Doc. 899 ¶ 30 n. 6.)

## 2. Coventry's Relationships

### a. Coventry—HCA Midwest

Following negotiations with HCA Midwest to amend the hospital provider agreement(s) that Coventry then had in place with HCA Midwest, Coventry entered into an agreement amendment with HCA Midwest on February 11, 2003. (Docs. 852 ¶ 21; 852 ¶ 24.) During the negotiations, HCA Midwest sought to include a network configuration clause which would require Coventry to obtain HCA Midwest's consent before adding any new facilities into its network. (Doc. 852 ¶ 22.) Coventry agreed to the network configuration clause proposed by HCA Midwest because Coventry already had contracts with all of the general hospital systems in the Kansas City metropolitan area and because this contractual provision aided Coventry's ability to negotiate more favorable reimbursement rates with HCA Midwest. (Doc. 852 ¶ 23.)

The 2003 Coventry–HCA Midwest amendment contained the following language:

2. Network Configuration. The parties acknowledge that [Health Midwest's] agreement to the payment of rates and other terms and provisions of the Agreements is in part a function of expected referral volume, and that the potential amount of such referral volume is in part a function of the composition of [Coventry's] network of Participating Providers. Although the Agreements do not require [Coventry] to deliver any minimum amount of referral volume to [Health Midwest], in light of the above acknowledgment, [Coventry] hereby agrees not to contractually or otherwise add any institutional Participating Providers (e.g., hospitals, ambulatory surgery centers, rehabilitation facilities, endoscopy centers, diagnostic imaging centers, radiation therapy facilities, etc.) that are physically located in Jackson County, Missouri or Johnson County, Kansas, to its Medicare + Choice HMO Participating Provider network (as such network existed on September 1, 2002) without the prior written consent of [Health Midwest]. [Coventry] hereby agrees not to contractually or otherwise add any institutional Participating Providers (e.g., hospitals, ambulatory surgery centers, rehabilitation facilities, endoscopy centers, diagnostic imaging centers, radiation therapy facilities, etc.) that are physically located in Jackson County, Missouri or Johnson County, Kansas, to its Commercial HMO, POS or PPO Participating Provider networks (as such networks existed on September 1, 2002), without the prior written consent of [Health Midwest], unless [Coventry] can satisfactorily demonstrate to [Health Midwest] that any such additions are required to meet access standards promulgated by regulatory or accreditation authorities.

(Doc. 852 ¶ 25.)

Coventry has entered into three subsequent provider agreements with HCA Midwest which likewise contain network configuration clauses. (Doc. 852 ¶ 27.) The 2004 Coventry–HCA Midwest provider agreement excludes specialty hospitals within Johnson County, Kansas and Jackson County, Missouri without prior approval from HCA Midwest. (Docs. 899 ¶ 30; 835 ¶ 51.) The parties also extended their network configuration provisions to cover all of Coventry's products in 2004. (Doc. 835 ¶ 52.)

The 2005 Coventry–HCA Midwest provider agreement excludes new facilities without HCA Midwest's prior consent, but

is not applicable to facilities owned by a participating general acute care hospital by a minimum of fifty percent. (Docs. 899 ¶ 30; 835 ¶ 52.) The current arrangement between Coventry and HCA Midwest provides that, if Coventry enters into a contract with niche providers without HCA Midwest's prior consent, Coventry's payment rates will automatically increase by ten percent. (Doc. 835 ¶ 53.)

In connection with Coventry's January 2007 provider agreement with HCA Midwest, HCA Midwest provided no analysis showing an anticipated decrease in volume if Coventry added a physician-owned facility to its network. (Doc. 899 ¶ 115.) HCA Midwest stated (in an internal memorandum discussing renewal versus termination of its contract with Coventry) that "Coventry cannot afford to lose our contract, and will end up acceding to our reasonable renewal expectations in order to avoid same." (Doc. 899 ¶ 5.)

### b. Coventry—Saint Luke's

In parallel with the HealthNet negotiations discussed above on page 13, Coventry was negotiating new hospital provider agreements with the individual hospitals that were the shareholders of HealthNet, including Saint Luke's. (Doc. 852 ¶ 6.) During these negotiations, Saint Luke's was aware that the sale and merger of the HealthNet network (which was a small, narrow network) into the larger Coventry network (which included more hospitals than the HealthNet network) would give the HealthNet members access to more hospitals once they were in the Coventry network. (Doc. 852 § 7.)

Saint Luke's negotiated to lock in its rates in its Coventry–Saint Luke's provider agreement based on that broader network, because the addition of other providers into the network would dilute the amount of business Saint Luke's would receive. (Doc. 852 ¶ 8.) Saint Luke's want-

ed to ensure that the Coventry–Saint Luke's provider agreement provided some limitation on the facilities that Coventry would permit in its network, so that Saint Luke's would maintain the volume it was bargaining for and could negotiate appropriate reimbursement rates based upon that expected volume. (Doc. 852 ¶ 9.)

As part of the negotiations of the Coventry–Saint Luke's provider agreement, Saint Luke's requested that a clause be added to the Coventry–Saint Luke's Provider Agreement which would require Coventry to obtain written approval from Saint Luke's before contracting with free-standing facilities, within a fifty mile radius of Kansas City, which opened subsequent to January 1, 2002. The agreed to network configuration clause also has an exception for certain hospital-owned providers that are not located within ten miles of Saint Luke's. (Doc. 852 ¶ 10.)

Coventry states that it was not opposed to the network configuration clause because Coventry had all of the other general hospitals in the Kansas City metropolitan area in its network. (Doc. 852 ¶ 11.) However, Coventry has also stated that it was interested in eliminating all of the network configuration language in its contracts. (Doc. 833 f 7.) Coventry was willing to agree to this network configuration clause because it allowed Coventry to obtain more favorable reimbursement rates in its contract with Saint Luke's. (Docs. 852 ¶ 12; 852 ¶ 13.) Additionally, if Coventry did not agree to the inclusion of the network configuration clause in its Coventry–Saint Luke's provider agreement, the purchase price of CHC, Inc.'s acquisition of the HealthNet network, and the reimbursement rates in the Coventry–Saint Luke's provider agreement would have been higher. Indeed, absent the network configuration clause Saint Luke's may

have refused to sell HealthNet at all. (Doc. 852 *1* 14.)

The Coventry–Saint Luke's provider agreement containing the network configuration language was finalized on December 2, 2002. (Doc. 852 ¶ 15; 835 ¶ 27.) The finalized agreement included the following network configuration clause:

> Carve Outs. The parties agree that [Coventry] will not contract with new free standing facilities within a fifty (50) mile radius of Kansas City which open subsequent to January 1, 2002 without prior written approval from [Saint Luke's]. [Coventry] shall be able to contract with free standing facilities which open subsequent to January 1, 2002 for services which [Coventry] currently sends HMO business to free standing facilities such as laboratory, radiology, hemodialysis, etc. and for which [Saint Luke's] currently does not contract. Also, in the event this conflicts with an existing agreement, [Coventry] shall be able to contract with free standing facilities which open subsequent to January 1, 2002 for which current Participating Hospital's have an ownership interest and the new facility is not within ten (10) miles of an existing [Saint Luke's] facility (including the planned Saint Luke's Lee Summit Campus at 1–470 and Douglas Rd). Should this conflict with the covenant not to compete in the Merger Agreement dated September 14, 2002, by and among Coventry Health Care, Inc., Coventry Merger Corporation, MidAmerica Health Partners, Inc. and certain of its shareholder (the "Merger Agreement"), this provision will govern.

(Doc. 852 SI 16.)

Effective January 1, 2007, Coventry and Saint Luke's amended multiple sections of the provider agreement, including the network configuration clause. (Doc. 835 ¶ 28.) The new network configuration clause provides that Coventry will not add hospitals, ambulatory surgery centers, or freestanding facilities to its network in Johnson County, Kansas; Wyandotte County, Kansas; Jackson County, Missouri; Clay County, Missouri; or Platte County, Missouri beyond its existing network as of September 1, 2006, without Saint Luke's prior written consent. (Docs. 899 ¶ 30; 835 ¶ 27.) This exclusivity covenant is not applicable to facilities that are majority owned (greater than fifty one percent) by an existing member hospital. (Docs. 835 ¶ 28; 899 ¶ 30; 835 ¶ 27.) In agreeing to the modification, Saint Luke's received rate increases and all facilities were added to two Coventry networks. (Doc. 835 SI 29.) Saint Luke's did not negotiate to retain authority to exclude facilities majority owned by physicians. The purpose of the Saint Luke's–Coventry contract provision was to ensure fifty-one percent control of free standing facilities by a hospital. (Doc. 835 SI 30.) Coventry performed no rate analysis in connection with the network configuration clauses in its contract with Saint Luke's. (Doc. 899 SI 114.)

### c. Coventry—Shawnee Mission Medical Center

Contemporaneous with entering into the HealthNet sale agreement, Shawnee Mission Medical Center contemplated that it would thereafter enter into a separate hospital provider agreement with Coventry that would incorporate a non-compete provision. (Docs. 835 ¶ 36; 852 ¶ 6.) On or about September 11, 2002, prior to entering into the HealthNet sale agreement, Saint Luke's/Shawnee Mission Health System entered into a hospital provider agreement with Coventry, which contained a network configuration clause. The network configuration clause provided that Coventry would not contract with any freestanding facilities within a fifty-mile radius of Kansas City after January 1, 2002, with-

out prior written approval from Saint Luke's/Shawnee Mission Health System. (Doc. 835 ¶ 36.)

On October 31, 2002, Saint Luke's and Shawnee Mission Medical Center terminated the Saint Luke's/Shawnee Mission Health System joint venture. (Doc. 835 ¶ 36.) On or about December 2, 2002, Shawnee Mission Medical Center executed the provider agreement between Coventry and Shawnee Mission Medical Center. (Doc. 835 ¶ 37.) The 2002 Coventry–Shawnee Mission Medical Center provider agreement (which contained network configuration language) had been fully negotiated by Saint Luke's/Shawnee Mission Health System. (Doc. 835 ¶ 37; 852 SI 17; 835 SI 34–35.)

Coventry agreed to include a network configuration clause in its provider agreement with Shawnee Mission Medical Center for the same reasons that it agreed to include this language in its hospital provider agreement with Saint Luke's (*i.e.,* rate concessions and no need for additional facilities). (Doc. 852 SI 19.) Shawnee Mission Medical Center understood that the negotiated rates contained in the 2002 Coventry–Shawnee Mission Medical Center provider agreement were predicated upon a certain volume of business that Shawnee Mission Medical Center could expect to receive, such that if Coventry's network were to expand, then the financial value of the contract to Shawnee Mission Medical Center would decrease. (Doc. 852 ¶ 20; 835 ¶ 35.)

Similar to the Coventry–Saint Luke's provider agreement, the 2007 Coventry–Shawnee Mission Medical Center provider agreement excludes new freestanding facilities within a fifty mile radius of Kansas City without Shawnee Mission Medical Center's prior consent, but is not applicable to facilities owned by a participating hospital by at least fifty-one percent, so long as that participating hospitals' ownership does not fall below fifty percent. (Doc. 899 ¶ 30.)

**d. Coventry—North Kansas City Hospital**

The managed care contracts entered into between Coventry and North Kansas City Hospital have never contained any restrictions on Coventry's ability to add new facilities. (Doc. 835 ¶ 20.)

**e. Coventry—Carondelet**

Carondelet was also a party to the HealthNet transaction. (Doc. 835 ¶ 9.) The HealthNet sale agreement contained a clause that addresses certain restrictions relative to ambulatory surgical centers. (Doc. 835 ¶ 10; 899 ¶ 108.) Specifically, the HealthNet sale agreement included a non-compete provision that prevented Coventry from adding ambulatory surgical centers to its network located within a certain distance from any shareholders' facilities.[14] (Doc. 835 ¶ 10.) Coventry and Carondelet discussed "carve-out" language, but ultimately agreed to let the merger agreement govern the issue. (Doc. 899 ¶ 109.) The Coventry–Carondelet provider agreement did not contain a non-compete provision, a carve-out provision, or any other language that would exclude Heartland or any similar entity from obtaining managed care contracts. (Doc. 835 ¶ 13.)

**3. Blue Cross's Relationships**

**a. Blue Cross—HCA Midwest**

Blue Cross entered into a provider agreement with HCA Midwest in 2000. Concurrently, the parties agreed to network configuration language for several products covered by the agreement. Pay-

---

14. Heartland does not consider itself to be an ambulatory surgical center. (Doc. 835 ¶ 11.)

ment rates and other terms and provisions of the addenda were predicated upon the configuration of Blue Cross's network for that product. Subsequent product-specific addenda also contained network configuration language. (Doc. 835 ¶ 49.)

In October 2003, Blue Cross and HCA Midwest agreed on a three-year contract renewal that included a new network configuration provision that required Blue Cross to notify HCA Midwest of its intention to add to its networks any new hospital or surgery center, and, in the absence of agreement between HCA Midwest and Blue Cross on revised payment rates, HCA Midwest could terminate its participation in Blue Cross's networks. HCA Midwest confirmed that this provision excluded all niche facilities. (Doc. 833 St 32.)

**b. Blue Cross—Saint Luke's**

Blue Cross has provider agreements with Saint Luke's for its PPO products and its "traditional contracts." There is no exclusivity provision in any agreement that Blue Cross has with Saint Luke's. (Doc. 835 § 25.)

**c. Blue Cross—Shawnee Mission Medical Center**

Blue Cross and Shawnee Mission Medical Center currently have a provider agreement (Doc. 835 ¶ 40) but it does not include any exclusivity language (Doc. 835 f 39).

**d. Blue Cross—North Kansas City Hospital**

Blue Cross has provider agreements with North Kansas City Hospital (Doc. 835 ¶ 15) and they contained network configuration clauses from 2001 through April 2004. The clauses excluded the addition of new "acute care hospitals." Blue Cross has referred to Heartland as a "hospital." (Doc. 899 ¶ 110.)

**e. Blue Cross—Carondelet**

The parties introduced no evidence of the existence of a contractual relationship between Blue Cross and Carondelet.

**4. United's Relationships**

**a. United—HCA Midwest**

In November 2006, United entered into a managed care letter agreement with HCA Midwest's parent company that became effective on January 1, 2007. (Doc. 835 ¶ 54.)

**b. United—Saint Luke's**

United has had a provider agreement with Saint Luke's since February 1, 2003, that provides that rates will be renegotiated if United increases the number of hospitals with which it contracts in Jackson County, Missouri or Johnson County, Kansas. (Doc. 835 ¶ 32.) On January 1, 2005, United entered into a new contract with Saint Luke's that increases the rates United will pay to Saint Luke's in the event HCA Midwest is added to the network. (Doc. 835 ¶ 33.)

**C. United—Shawnee Mission Medical Center**

United had a provider agreement with Shawnee Mission Medical Center. (Doc. 835 ¶ 40.) On April 12, 2007, Shawnee Mission Medical Center dropped out of United's network after failing to reach an agreement to renew its contract. Shawnee Mission Medical Center was out of United's network for almost two months before it was able to reach a provider agreement with United. (Doc. 835 ¶ 42.)

**d. United—North Kansas City Hospital**

United has a provider agreement with North Kansas City Hospital but it does not

contain a network configuration clause. (Doc. 835 ¶ 20.)

**e. United—Carondelet**

The parties introduced no evidence of the existence of a contractual relationship between United and Carondelet.

**5. Cigna's Relationships**

**a. Cigna—HCA Midwest**

In 1994, Cigna and HCA Midwest entered into a provider agreement that contained a network configuration provision covering some of Cigna's products, and extended that provision to Cigna's HMO products in 2002. This network configuration clause provided that the addition of any hospital in Johnson County, Kansas, or Jackson County, Missouri, that did not already participate in Cigna's network, would trigger predetermined rate increases. (Doc. 835 ¶ 47.)

In negotiations with HCA Midwest in February 2004, Cigna sent HCA Midwest a memo expressing legal and business concerns in connection with HCA Midwest's exclusivity proposal. (Doc. 833 ¶ 66.) In 2005, Cigna and HCA Midwest modified the network configuration provision to allow Cigna to add to its network "traditional" acute care full service hospitals and any entity that is majority owned by "traditional" hospitals. (Docs. 835 ¶ 48; 833 ¶ 66; 899 ¶ 30.) However, if Cigna added "specialty" or "niche" hospitals that were not affiliated with "traditional" hospitals, without HCA Midwest's consent, Cigna would increase its rates to HCA Midwest. (Docs. 835 ¶ 48; 899 ¶ 30.)

**b. Cigna—Saint Luke's**

Cigna has two provider agreements with Saint Luke's. The HMO/PPO provider agreement was effective November 22, 2004. (Doc. 835 ¶ 26.) The provider agreement contains a provision that requires CIGNA and Saint Luke's to meet to discuss renegotiating rates in the event CIGNA contracts with providers that Saint Luke's determines have a material adverse financial impact on the hospital. (Doc. 835 ¶ 26.)

**c. Cigna—Shawnee Mission Medical Center**

Cigna currently has a provider agreement with Shawnee Mission Medical Center (Doc. 835 ¶ 40) but it does not contain network configuration language. (Doc. 835 ¶ 39.)

**d. Cigna—North Kansas City Hospital**

Cigna has a provider agreement with North Kansas City Hospital, but it does not contain network configuration language. (Doc. 835 SI 20.)

**e. Cigna—Carondelet**

While negotiating its 2005 provider agreement with Cigna, Carondelet attempted to negotiate network configuration language to exclude niche facilities not majority owned by a traditional hospital. (Doc. 899 ¶ 30 n. 6.)

**6. Humana's Relationships**

**a. Humana—HCA Midwest**

Humana, or its predecessor Prime Health, has had a network configuration provision with HCA Midwest or its predecessor entities since 1986. HCA Midwest became Humana's "sole and exclusive provider of inpatient and outpatient hospital services" for some products in Jackson County, Missouri in 2002. (Doc. 835 ¶ 46.) On October 29, 2002, Humana internally discussed what it perceived was HCA Midwest's new policy of negotiating contract language that prohibits Humana from contracting with specialty hospitals. Humana stated that it would not agree to such a

contract. In the parties' agreement signed in December 2003, however, Humana and HCA Midwest included an exclusivity provision. (Doc. 833 ¶ 65.)

In December 2003, Humana and HCA Midwest agreed to expand the scope of the network configuration provision to cover Humana's PPO products and healthcare providers in Johnson County, Kansas. (Doc. 835 ¶ 46.) Humana's 2004 provider agreement with HCA Midwest provided that Humana's network would not include any new facilities in Johnson County, Kansas or Jackson County, Missouri and HCA Midwest communicated to Humana that HCA Midwest wanted boutique facilities excluded. (Docs. 899 ¶ 30; 833 ¶ 31.)

### b. Humana—Saint Luke's

Effective February 1, 2005, Humana entered into a provider agreement with Saint Luke's for one of Humana's products. The parties agreed that the network would not include four named Kansas City area hospitals, including North Kansas City Hospital and HCA Midwest. Saint Luke's wanted to direct the volume of this product to its facilities to ensure that there was enough volume to make the contract worthwhile. Humana provided assurances during contract talks with Saint Luke's that it would not contract with boutique hospitals. (Doc. 833 ¶ 31.)

### c. Humana—Shawnee Mission Medical Center

Humana currently has a provider agreement with Shawnee Mission Medical Center (Doc. 835 ¶ 40), but it contains no network configuration language. (Doc. 835 ¶ 39.)

### d. Humana—North Kansas City Hospital

Humana's provider agreement with North Kansas City Hospital did not contain network configuration clauses related to Johnson County, Kansas or Jackson County, Missouri. (Doc. 835 ¶ 19.)

### e. Humana—Carondelet

The parties introduced no evidence regarding the existence of a contractual relationship between Humana and Carondelet.

### E. Heartland's Attempts to Obtain MCO Contracts

Beginning in 2003, Heartland communicated with the MCO Defendants to attempt to negotiate an in-network contract with the MCO Defendants. (Doc. 833 ¶ 68.) Dr. Reed, a physician founder of Heartland, reported in an April 2003 board meeting that he had met with HCA Midwest, Coventry, and United and had "good initial responses at least in the discussion phase." (Doc. 899 ¶ 83.) The first written communication from Heartland to any MCO regarding contracting issues was a letter mailed out by Heartland's chief executive officer on July 11, 2003. (Doc. 852 ¶ 40.) Heartland had no MCO provider agreements when it opened in September 2003. (Doc. 778 ¶ 21.)

Heartland filed suit on April 26, 2005, with the goal of obtaining MCO provider agreements. (Doc. 778 ¶ 33.) As of December 14, 2006, Heartland had obtained approximately five to ten MCO provider agreements. (Doc. 778 ¶ 31.) Heartland remained out of network with all MCO Defendants until 2007, when it obtained in-network contracts with United and for some plans with Blue Cross. (Doc. 833 ¶ 68 n. 20.)

### 1. Aetna

Heartland first tried to obtain an in-network contract from Aetna two months before Heartland planned to open. On July 11, 2003, Heartland sent a form letter to Aetna. (Doc. 778 ¶ 20.) Heartland had no earlier communication with Aetna and

had not previously communicated with Aetna concerning Aetna's needs or how Aetna defined "market need." (Doc. 778 ¶¶ 21, 23.) On July 23, 2003, Aetna declined Heartland's request for a provider agreement and informed Heartland that Aetna would not be adding Heartland to its network. (Doc. 778 ¶ 24.)

Aetna defines "market need" as repeated requests from brokers, individual employer groups, and individual policy-holders to include a provider in its network. Factors Aetna uses to determine "market need" are: 1) whether Aetna requires the provider to meet state access standards; 2) whether Aetna won or lost customer groups because the provider was not in its network; 3) whether there is significant out-of-network use of the provider; and 4) whether the provider offers unique services that no one else in the area has. (Doc. 778 ¶ 26.)

In the July 23, 2003 letter to Heartland responding to Heartland's request for an in-network contract, Aetna stated that its network is:

> very adequate to meet our membership needs and we will not be adding any additional facilities. In addition, Aetna has an agreement with a hospital system in Kansas City containing a provision for adding new hospitals and ambulatory surgery centers, in Jackson County, MO and Johnson County, KS, on a 'Network Need' basis only.

(Doc. 833 ¶ 72.)

Heartland made additional requests to Aetna in August 2003, September 2003, November 2003, and October 2004. (Doc. 833 ¶ 72.) In response to the September 2003 request to add Heartland to its network, Aetna did not mention a network need analysis, review the list of physicians

affiliated with Heartland, or analyze the out-of-network utilization by Aetna's insureds of Heartland. Aetna simply stated that "an exclusive contract with a hospital system in town prevents us from adding" Heartland. (Doc. 833 ¶ 76.)

From 2003 forward, Aetna granted the request of every facility majority owned by a traditional hospital that asked to be admitted to Aetna's network. (Doc. 833 ¶ 74.) Since 2002, Aetna has contracted with all of the ambulatory surgery centers affiliated with traditional acute care hospitals in Aetna's networks that have opened in the Kansas City metropolitan area, so long as the hospitals own at least fifty-one percent of the new facility. (Doc. 833 ¶ 12.)

In December 2005, Aetna added one limited service provider majority owned by physicians. (Doc. 833 ¶ 74.) Aetna determined there was a market need for orthopaedic providers when it added this physician-owned facility. Aetna has also informed Saint Luke's that there is a need for more physicians practicing neurosurgery.[15] (Doc. 833 ¶ 77.)

## 2. Coventry

In approximately 2000, Dr. Reed spoke with Coventry's medical director regarding his thoughts on developing a "Center of Excellence" physician-owned facility in Kansas City, and Coventry's medical director affirmed that he thought this was a good idea. (Doc. 899 ¶ 81.) Heartland communicated to Coventry throughout 2003 and 2004 asking for in-network contracts with Coventry. (Docs. 899 ¶ 87; 852 ¶ 41.) Coventry told Dr. Reed that it understood that Heartland was "doing an excellent job of taking care of patients, but

---

**15.** In addition, in a 2005 study, Saint Luke's determined that payors it had interviewed (which included Aetna, Blue Cross, Cigna, Coventry, and United, *i.e.*, all the MCO Defen-

dants) identified needs for orthopaedic and neurosurgery physicians throughout the Kansas City area. (Doc. 899 ¶ 77.)

contract provisions [Coventry has] will currently prevent [Coventry] from entering into any extensions of contracts" to Heartland. (Doc. 899 ¶ 86.)

A representative of Coventry told Dr. Reed that he did not understand the "resistance within the organization" to contracting with physician-owned facilities and that Shawnee Mission Medical Center, Saint Luke's, and Carondelet were putting pressure on Coventry not to deal with Heartland. (Doc. 899 SI 84–85.) Coventry's medical director also communicated to Dr. Reed "similar suspicions or similar concerns." (Doc. 899 ¶ 85.)

In October 2003, Heartland asked Coventry to tour Heartland's facility prior to Coventry making any decisions related to network need. In discussing this request, Coventry stated: "As you know, we have limitations based on the agreement with [Saint Luke's]." Coventry also discussed that it should determine if Heartland possessed an imaging system or procedures that were not available in its network. (Doc. 899 ¶ 91.)

Coventry toured Heartland prior to Heartland opening. (Doc. 899 ¶ 92.) Prior to touring Heartland, Coventry knew that it had network configuration commitments with hospitals (HCA Midwest, Saint Luke's and Shawnee Mission Medical Center) that limited Coventry's ability to add Heartland to its networks. (Doc. 899 ¶ 89.) Coventry's medical director visited Heartland and reported back to Coventry that he was impressed with the facility and that Heartland had one of the newest MRI machines on the market. (Doc. 899 ¶ 82.) Other representatives from Coventry also toured Heartland and reported internally

that Heartland "was a nice facility, state of the art." (Docs. 899 ¶ 82; 833 ¶ 15.)

Coventry's vice president of provider affairs again reviewed Heartland's request for an in-network contract during internal discussions in April 2004. Coventry once again toured the Heartland facility in April 2004. During the tour, Heartland shared its quality related data with Coventry and emphasized its MRI machine and patient convenience. (Doc. 899 ¶ 93.)

Coventry alleges that it decided not to enter into an in-network provider contract with Heartland for several reasons: 1) it would violate the network configuration clauses contained within Coventry's existing contracts with Saint Luke's, Shawnee Mission Medical Center and HCA Midwest; 2) there were concerns about self-referrals and over-utilization by the physician owners of specialty hospitals; 3) there were concerns over what would happen to a patient if an emergent situation arose at a facility that did not have the ability to handle such an emergency; 4) the physician owners of Heartland were already participating providers for Coventry who had privileges to perform procedures at other facilities within Coventry's network; 5) Coventry's network was sufficient and it had no network need for Heartland's facility; and 6) Coventry's biggest client (Sprint) had expressed its desire that Coventry not add any new facilities to its network.[16] (Doc. 852 ¶ 42.)

In 2004, one of Coventry's clients, Union Pacific Railroad, inquired about Coventry's ability to solicit Heartland for its network. (Doc. 899 SI 88.) Coventry informed Union Pacific Railroad that Heartland was

---

**16.** Coventry received a letter from the vice president of compensation and benefits for Sprint, E.J. (Ned) Holland, on June 3, 2002 which specifically requested that Coventry not add any new facilities to networks that serve Sprint employees. Sprint believed that the addition of new facilities would lead to rate increases to pay for overcapacity, which would ultimately increase what it cost Sprint to provide healthcare to its employees. (Doc. 852 ¶ 44.)

"excluded by several hospital contracts that [Coventry has] in place" and "specifically excluded by more than one health system." (Doc. 899 ¶ 89.)

In 2005, Coventry sought to determine the overall impact of its network configuration commitments with hospital providers and stated that the provisions were confusing and becoming restrictive. Coventry had internal discussions about a desire to eliminate all network configuration language because "then [it] could just run [its] business" and "it would have made life easier" to disassociate itself with the network constraints. (Doc. 899 ¶ 90.)

Heartland is the only specialty hospital or surgery center in the Kansas City area majority owned by physicians that has requested and been denied access to Coventry's networks. (Doc. 899 ¶ 95.) In an internal e-mail in July 2005, Coventry identified Heartland on its list of "alternative hospitals within 10 miles of North Kansas City Hospital" that "provide competitive savings" and "have comparable charges." (Doc. 899 ¶ 94.) Coventry never had a conversation with any of its participating hospital facility providers that there was no market need for freestanding ambulatory surgical centers in the Kansas City area. (Doc. 899 ¶ 97.) Prior to deciding not to contract with Heartland, Coventry did not solicit input from patients, employers, or brokers in the Kansas City area regarding whether Heartland would be an appropriate addition to Coventry's networks and does not recall whether Coventry examined the out-of-network utilization at Heartland. (Doc. 899 SI 98.) Coventry's director of network development was never asked to do a needs analysis to evaluate whether to contract with Heartland. (Doc. 899 ¶ 99.) When asked whether there were any documents that reflected Coventry's decisionmaking process with respect to Heartland, Coventry

replied: "Other than our network configuration clause, grid, no, there was no need for further analysis." (Doc. 899 1 101.)

### 3. Blue Cross

As of June 2004, Heartland was not in-network for any HMO or PPO Blue Cross network. (Doc. 899 ¶ 21.) Heartland does have a "PAR" agreement with Blue Cross. A "PAR" agreement between an MCO and a hospital means that the hospital is not an in-network provider but that the MCO has negotiated rates for the hospital and provides direct payment to the hospital for any available benefits. (Doc. 833 ¶ 56 n. 18.)

Blue Cross told Heartland it was yielding to pressure put on Blue Cross by its network hospitals to not contract with Heartland. (Doc. 833 1 28.) In January 2005, Blue Cross stated, in an internal assessment, that its 2000 assessment of the market was that Blue Cross and other carriers maintained tight ambulatory surgery center networks, partially due to pressure from major hospital systems. (Doc. 899 ¶ 16; 833 ¶ 22.)

### 4. United, Cigna, and Humana

The parties introduced no facts regarding United, Cigna, and Humana's decisions not to contract with Heartland.

### F. Defendants' Internal Expressions Concerning Specialty Hospitals

#### 1. MCO Defendants

The MCO Defendants are competitors in the Kansas City area.[17] Individually, the MCO Defendants expressed their views of network configuration language. For example: Aetna desired not to have any network configuration clause in any contract; Coventry was interested in eliminating all of the network configuration

---

17. For example, Coventry recognized Blue Cross as a competitor. (Doc. 899 ¶ 102.)

language in its contracts and one of Coventry's objectives in its negotiations with HCA Midwest was to eliminate or reduce network configuration clauses; and Cigna attempted to eliminate exclusive contracts that limited what facilities Cigna could include in its networks, both in the Kansas City area and nationwide (Doc. 833 ¶ 7).

Some of the MCO Defendants also internally expressed their views regarding specialty hospitals. For example: In an internal document produced in 2003, Humana stated that the "major systems, Health Midwest and St Luke's Shawnee Mission, view [physician-owned/invested facilities/services] as direct competitors targeting their profitable outpatient business" (Doc. 833 ¶ 14); Humana also stated that "[a]rea hospitals are placing intense pressure on carriers not to contract with these entities" (Doc. 833 ¶ 17); Humana also discussed internally in 2003 that it was receiving pressure from HCA Midwest to not contract with boutique facilities (Doc. 833 ¶ 16); in 2002, Blue Cross met internally to discuss "the new wave of physician-sponsored institutional ventures" and met in 2004 to discuss surgicenters and ambulatory surgery centers (Doc. 833 ¶ 14); and in an internal document in October 2005, an Aetna employee wrote that he had heard from providers that local hospital systems, including the Hospital Defendants, had done a good job keeping lower cost providers such as physician-owned surgery centers, from contracting with managed care plans (Doc. 833 ¶ 17).

### 2. Hospital Defendants

The Hospital Defendants internally extensively discussed their concerns regarding specialty hospitals, in general, and Heartland, in particular.

### a. HCA Midwest

HCA Midwest views Heartland as a competitive threat. In 2003, HCA Midwest discussed internally the risk assess-

ment of niche competition and maintained a list of niche providers in its market. HCA Midwest worked on an updated list in 2004 and recognized this risk again in 2005. HCA Midwest also internally discussed niche competition at a 2006 meeting regarding its 2004 budget review. (Doc. 833 ¶ 14.) HCA Midwest used the term "niche facility" to refer to specialty hospitals, ambulatory surgery centers, and other freestanding facilities that are "independent, free-standing and not aligned with a traditional general acute care hospital." (Doc. 899 ¶ 14.)

In June 2003, HCA Midwest internally discussed a future physician-owned facility opening at Heartland's present location and stated: "The MDs clearly prefer an HCA JV deal so that they can get the managed care contracts.... Bottom line: We have high risk of losing this volume if the regulatory environment doesn't help us out. We may need to accelerate our plan to take the fight to the Mds more aggressively and openly if they stay so entrenched in their business model." (Doc. 899 ¶ 105.) HCA Midwest identified a "counter measure for MD threats" as "managed care payors ([Blue Cross])." (Doc. 899 ¶ 105.) HCA Midwest also prepared talking points for a meeting with Blue Cross concerning Blue Cross's addition of niche providers to its networks which stated HCA Midwest's desire to not add specialty hospitals to the Blue Cross networks. (Doc. 833 I 21.)

In a November 2003 division meeting, HCA Midwest listed under its "Summary of Concerns" that its inpatient facilities were "under attack from physician-syndicated specialty hospitals (particularly in high margin services)" and stated a refinement of its operating strategy as: "Reinforce the inpatient franchise, both offensively and defensively, through market share expansion programs and strategies to counter physician syndicated competi-

tors." HCA Midwest intended to go on the offense to protect its market share. HCA Midwest planned to "utilize managed care relationships more effectively to protect and grow business" with regard to configuration provisions. (Doc. 899 ¶ 106.)

In an internal memorandum in October 2004, HCA Midwest asked "What is [the] value of allowing MCOs to add niche facilities to networks?" and responded: "Suggest minimum of 50% rate increase on affected services. No real basis for this penalty percent." HCA Midwest suggested contract language with up to 78% rate increases if contracts between it and Cigna did not include a network configuration clause. (Doc. 899 1 116.)

HCA Midwest's contracts with the MCO Defendants for the 2004 budget year included network configuration clauses that excluded new niche facilities. (Doc. 833 ¶ 33.) HCA Midwest currently has managed care contracts with Aetna, Humana, Cigna, Blue Cross and Coventry. (Doc. 835 ¶ 43.) HCA Midwest did not perform a loss of volume analysis to determine whether it would suffer losses if niche facilities were added to the Blue Cross, Aetna, Cigna, Humana, or Coventry networks. (Docs. 833 ¶ 76 n. 22; 899 ¶ 113.) HCA Midwest conducted no analysis for any of the managed care organizations justifying a rate penalty for adding niche or specialty hospitals and no analysis of the economic impact of physician-owned specialty hospitals on the profitability of HCA Midwest. (Doc. 899 ¶ 113.)

**b. Saint Luke's**

One of the significant competitive threats Saint Luke's has identified since 2002 has been physician-owned hospitals and ambulatory surgery centers. In 2002, Saint Luke's began to be concerned about new free-standing facilities and rumored specialty hospitals. (Doc. 833 ¶ 14.) On March 21, 2005, Saint Luke's internally discussed new majority physician-owned facilities, stated that it "should push managed care companies not to contract" with the non-hospital majority-owned facilities, and that it had notified United, Cigna, and Aetna of its concerns. (Doc. 833 ¶ 61.) In response to a April 2005 resolution from the Kansas House of Representatives regarding "the benefits of specialty hospitals," Saint Luke's expressed concern over how the resolution happened. (Doc. 899 ¶ 107.)

During contract negotiations with United, Saint Luke's calculated the loss of volume it would experience if United added HCA Midwest to its network and ultimately agreed that the rate increase for adding HCA Midwest to United's network would range from zero to two percent. (Doc. 899 ¶ 117.) Saint Luke's performed no analysis of the impact on its facility that would result from Heartland obtaining in-network contracts with MCO Defendants. (Doc. 899 ¶ 113.)

**c. Shawnee Mission Medical Center**

Shawnee Mission Medical Center has publicly stated that it is opposed to the proliferation of specialty hospitals or surgery centers that are not at least fifty-one percent owned by traditional hospitals. (Doc. 899 1 64.) In November 2003, Shawnee Mission Medical Center discussed its "[a]bility to compete with new facilities with private rooms and plasma TV's" and in its notes to support its discussion stated: "Most competitors have private rooms-cite niche hospitals especially Heartland . . . ." (Doc. 899 ¶ 15.) Also in 2003, Shawnee Mission Medical Center planned to contact its insurers regarding contracting with Heartland. (Doc. 833 ¶ 26.) In 2004, Shawnee Mission Medical Center identified niche hospitals as a market issue. In 2005, Shawnee Mission Medical Center considered Heartland to be a competing

hospital and has internally identified Heartland as one of its competitors. Shawnee Mission Medical Center has also testified that it considers Heartland a competitor. (Doc. 833 ¶ 14.) A Heartland founding physician, Dr. Hoehn, testified that Shawnee Mission Medical Center's chief operating officer told him that Shawnee Mission Medical Center was going to find a way to either put Heartland out of business or hurt Heartland's contracting so bad that Heartland would be crippled and unsuccessful. (Doc. 833 ¶ 28.) Dr. James Maloney, the father-in-law of a Heartland founding physician has provided an affidavit stating that Shawnee Mission Medical Center's chief executive officer told him that Shawnee Mission Medical Center would do whatever was necessary to ensure that Heartland would not succeed as a doctor-owned facility.[18] (Docs. 833 ¶ 28; 899 ¶ 28.)

### d. Carondelet

Carondelet views Heartland and other niche facilities as having an impact on the market. (Doc. 833 ¶ 14.) When Heartland entered the market, Carondelet believed the market was moving toward "open access," and MCOs were attempting to eliminate contractual exclusivity language that limited the facilities that could be included in the networks. (Doc. 833 ¶ 7.)

Carondelet has never requested to renegotiate reimbursement terms with an MCO due to an MCO's addition of a provider. (Doc. 835 ¶ 5.) Carondelet has been denied managed care contracts due to the network configuration clauses that defendant MCOs have with other hospitals in the area. (Doc. 835 ¶ 8.)

### G. Communications Between and Amongst Defendants

Over the course of 2003, Hospital Defendants contacted MCO Defendants and sought assurances that MCO Defendants would not add a facility like Heartland to their networks. These communications are evidenced by the following:

- Coventry was contacted by Saint Luke's after Saint Luke's learned Heartland was going to be built and advised that Saint Luke's would not approve of Coventry contracting with Heartland and allowing Heartland into its network. (Doc. 899 ¶ 96.)

- In 2003, Saint Luke's sought and received assurances from United and Blue Cross that the two MCOs would not contract with two specific physician-owned facilities. (Doc. 833 ¶ 54.)

- In 2003, Saint Luke's e-mailed an affiliate of North Kansas City Hospital with contract provisions Saint Luke's had or was proposing to all its "major payors" to "facilitate discussion." (Doc. 833 ¶ 40.)

- Saint Luke's questioned Aetna in 2003 whether Aetna had a contract with Heartland. Aetna responded that it did not. (Doc. 833 ¶ 54.)

- HCA Midwest's contract negotiations with United in the Fall of 2003 contemplated excluding freestanding niche specialty hospitals. (Doc. 833 ¶ 34.)

---

**18.** The Hospital Defendants object to Dr. Maloney's statement as "hearsay" (Doc. 920 at 5) without citing the Rules of Evidence or case authority. Inadmissible hearsay cannot be relied upon either to support or oppose summary judgment. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1121 (10th Cir.2007). However, it is not clear that Dr. Maloney's statement *is* hearsay (Rule 801(d)(2)(A) and/or (E)) or, possibly, an exception (Rule 804(b)(3)). This question may have to be resolved at a later date but for now, the Hospital Defendants' generic "hearsay" objection is insufficient.

- In 2003, HCA Midwest notified Blue Cross of the names of the Heartland founding physicians and requested that Blue Cross "monitor their referral practices" to ensure that Blue Cross's worker's compensation business was not "leaking" to Heartland. (Doc. 833 ¶ 54.)
- In response to an e-mail from HCA Midwest in June 2003, Humana characterized HCA Midwest's sensitivity to boutique hospitals as "increasing." (Doc. 833 ¶ 57.)
- Over the course of 2003 and 2004, HCA Midwest and Saint Luke's communicated to Aetna that they did not want Aetna to contract with physician-owned facilities that were not at least fifty-one percent owned by a traditional hospital. (Doc. 833 ¶ 23.)
- In late 2003 and early 2004, Coventry and Blue Cross told David Vaughn, who worked with Heartland on operating Heartland's pharmacy, that they would not give Heartland an in-network contract because they did not want to cross certain local hospitals, mentioning specifically Saint Luke's and Shawnee Mission Medical Center. Coventry and Blue Cross also told Vaughan that Kansas City hospitals, specifically Saint Luke's and Shawnee Mission Medical Center, were pressuring Coventry and Blue Cross not to contract with physician-owned specialty hospitals like Heartland. (Doc. 833 ¶ 28.)
- In late 2003 or early 2004, Blue Cross told Vaughn that "managed care organizations like Blue Cross would not contract with Heartland because Blue Cross had agreed with its member hospitals in the Kansas City area not to contract with physician-owned facilities like Heartland." (Doc. 833 SI 28.)

In early 2004, after Heartland opened, Blue Cross received inquiries from HCA Midwest, Shawnee Mission Medical Center, North Kansas City Hospital, and Saint Luke's concerning Blue Cross's contract status with Heartland. (Doc. 833 ¶ 22; 833 ¶ 56.) Blue Cross responded to these inquiries that it did not have an in-network contract with Heartland and that Heartland was only a participating Blue Cross provider. (Doc. 833 ¶ 22; 833 ¶ 56; 899 ¶ 56.)

HCA Midwest and Saint Luke's were concerned that if one MCO Defendant contracted with Heartland, other MCO Defendants would follow suit. (Doc. 833 ¶ 9.) In August 2004, in an internal e-mail describing rate negotiations between Saint Luke's and Blue Cross, Saint Luke's stated: "[Blue Cross] has taken our side by denying participation, but the physicians have good arguments: can schedule faster, convenient, 'better' quality etc. But the [ambulatory surgery centers] are probably taking the easy cases, which will cause hospitals to need higher rates. Physicians are saying that [Blue Cross] is in collusion with hospitals on this issue." (Doc. 833 ¶ 59.) On March 7, 2005, in an internal e-mail, Saint Luke's stated that it "very much appreciate[d]" Blue Cross's position not to contract with ambulatory surgery centers, limited service providers, and physician-owned hospitals but that "with United caving in to [Heartland] it is likely [Blue Cross] will soon be caving in to these ventures as well." (Doc. 833 ¶ 60.)

Also in 2004, HCA Midwest asked Blue Cross and Cigna to confirm that they were not contracting with Heartland. In response to Cigna's denial, HCA Midwest stated: "Thanks for confirming what I thought was the case re [Heartland]. I think they're desperate, hoping that they can convince an MCO that they're being added to everybody else's networks so that MCO will feel the pressure to also add. All he probably thinks he needs is one

deer-in-the-headlights MCO to *cave,* and then the rest will fall like dominos." (Doc. 833 ¶ 55.)

HCA Midwest communicated to Cigna during 2004 contract negotiations that it was not being treated any differently than the other managed care organizations with whom HCA Midwest also had a provider agreement in the Kansas City area. (Doc. 833 ¶ 24.) While negotiating its 2004 contract with Aetna, HCA Midwest communicated to Aetna its concerns regarding specialty hospitals, using Heartland as an example, and wanted to ensure Aetna would not contract with Heartland. (Doc. 833 ¶ 14.)

In 2004, Shawnee Mission Medical Center and HCA Midwest met to discuss specialty hospitals, among other things. (Doc. 833 ¶ 41.) In an internal meeting, HCA Midwest stated that HCA Midwest and Shawnee Mission Medical Center had spent a lot of time working on ways to deal with the specialty hospital threat. (Doc. 833 ¶ 41.) On April 9, 2004, HCA Midwest e-mailed Cigna and Humana to determine if Cigna and Humana's patients were being treated by niche providers on an out-of-network basis. (Doc. 833 ¶ 57.) In an internal e-mail, Humana characterized HCA Midwest's endeavor as a "witch hunt." (Doc. 833 ¶ 57.)

In May 2004, Coventry "confronted" HCA Midwest on Heartland's participating agreement with Blue Cross. (Doc. 833 ¶ 49.) Coventry stated that HCA Midwest appreciated the information and would be investigating whether Heartland had a participation agreement with Blue Cross. (Docs. 833 ¶ 49; 899 ¶ 49.) Also in May 2004, Coventry mentioned Heartland's Blue Cross agreement with Saint Luke's and reported internally that Saint Luke's planned to "investigate." (Doc. 833 ¶ 49.)

In 2004, Saint Luke's discussed an upcoming meeting with Blue Cross to talk about "all the [Blue Cross] business and

hopefully recognize that they work with us well, restraining free standing facilities...." In 2004, Saint Luke's also discussed new surgicenters and hospitals with Blue Cross and indicated its position that Blue Cross should not contract with the new centers. (Doc. 833 ¶ 14.)

On May 11, 2004, Saint Luke's sent an email to Aetna and United regarding Heartland's use of Aetna and United's names on Heartland's website, implying that Heartland contracted with these MCOs. (Doc. 833 ¶ 46; 833 ¶ 58.) Saint Luke's informed Aetna and United that Cigna and Coventry were not listed on Heartland's website. Aetna replied that it had contacted Heartland and requested that Heartland's website be reworded. (Doc. 833 ¶ 46.) In May 2004, Aetna was also contacted by HCA Midwest regarding Heartland's naming of Aetna on its website. (Doc. 833 ¶ 58.) Saint Luke's contacted Blue Cross on the same date with the same concerns regarding Heartland's listing of Blue Cross on its website. Blue Cross responded to Saint Luke's that it did not have an in-network contract with Heartland. (Doc. 833 ¶ 46.)

In May 2004, Coventry's chief executive officer's position was that Coventry did not want HCA Midwest and Saint Luke's to add new facilities. However, Coventry has since committed to Carondelet, HCA Midwest, Shawnee Mission Medical Center, and Saint Luke's that it will add new facilities to its networks that are at least majority owned by these Hospital Defendants. (Doc. 899 ¶ 100.)

Janet Stallmeyer was president and CEO of Coventry from 1999 until September 2006. (Doc. 835 ¶ 70.) In late 2004 or early 2005, Stallmeyer received a call from Bruce Van Cleave, then president and CEO of Carondelet, who asked that Coventry add South Kansas City Surgicenter, recently acquired by Carondelet, into its

network. (Doc. 835 SI 70.) In response to Mr. Van Cleave's request, Ms. Stallmeyer contacted executives at the three hospitals that had contracts with Coventry with network configuration clauses that would have precluded the addition of South Kansas City Surgicenter to ask each hospital whether it would change or eliminate the network configuration language in its contract with Coventry. (Doc. 835 ¶ 71; 833 ¶ 50.) The existing network configuration clauses in contracts between these entities prevented Coventry's addition of the South Kansas City Surgicenter. (Doc. 833 ¶ 51.)

Stallmeyer had separate discussions with HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center executives. (Docs. 899 ¶ 53; 835 ¶ 72.) HCA Midwest and Saint Luke's each indicated that it was not willing to eliminate network configuration language. (Doc. 835 ¶ 72.) Shawnee Mission Medical Center orally agreed to delete Shawnee Mission Medical Center's network configuration language, but this conversation was not memorialized in writing at that time. (Doc. 835 SI 72.) Shawnee Mission Medical Center agreed to allow Coventry to add a facility majority owned by Carondelet to Coventry's networks as long as Saint Luke's and Carondelet agreed to the same type of waiver for facilities majority owned by Shawnee Mission Medical Center. (Doc. 899 ¶ 12.) Over the course of 2005 and 2006, Coventry engaged in further negotiations with Saint Luke's, Shawnee Mission Medical Center and HCA Midwest seeking to modify Coventry's contract with each to allow free-standing facilities, majority-owned by a participating hospital, to be added to Coventry's networks. (Doc. 835 ¶ 74.)

Saint Luke's testified that Aetna, Blue Cross, Cigna, Coventry, Humana, and United indicated a willingness to extend contracts to Saint Luke's new facility, the Saint Luke's South Surgicenter. (Doc. 899 ¶ 12.) In addition, HCA Midwest agreed to allow traditional hospital competitors to be added to the Blue Cross network without penalty to the MCO or pursuing rate renegotiations. (Docs. 833 SI 12; 899 % 12.)

On March 21, 2005, Saint Luke's communicated to Aetna that, while it recognized that Aetna had not taken a firm position, it hoped "Aetna continues to follow the approach of not contracting with freestanding centers unless they are owned at least 51% by hospitals with which Aetna contracts." (Doc. 833 ¶ 62.) On March 21, 2005, Saint Luke's sent the same communication to Cigna. Cigna replied: "message understood." (Doc. 899 ¶ 62.)

In April 2005, Shawnee Mission Medical Center e-mailed Coventry and discussed its "outpatient facility development" and asked if Coventry's contract with HCA Midwest contained exclusivity language in Johnson County, Kansas. Shawnee Mission Medical Center then stated: "I'm assuming that this will be an issue for you, and that we would need HCA [Midwest] to waive this exclusivity (similar to what we're doing for [Carondelet] ). If this is in fact the case, how would you prefer that we address this issue with HCA [Midwest]? [We] would be willing to have initial discussions, but I don't want to do anything without your knowledge and/or involvement." (Doc. 899 $41.)

On May 5, 2005, an affiliate of HCA Midwest communicated with an employer concerning Heartland. That employer then e-mailed HCA Midwest, Cigna, and Coventry regarding whether they were contracting with Heartland. Cigna responded to the employer, HCA Midwest, and Coventry that it was not contracting with Heartland. Coventry also responded to the employer, HCA Midwest, and Cigna that it was not contracting with Heartland and hoped that a local hospital/hospital

system would not purchase the facility. (Doc. 833 ¶ 45.)

A Coventry employee testified that in 2006, regarding changes or modifications to Shawnee Mission Medical Center's network configuration language to permit joint venture majority ownership by participating hospitals, Coventry's CEO had meetings and discussions with HCA Midwest, Shawnee Mission Medical Center, and Saint Luke's because it "required all to be cooperative with each other." (Doc. 833 ¶ 52; 833 ¶ 53.)

Either prior to or in March 2006, Coventry heard that HCA Midwest did not participate in any networks that Heartland also participated in. (Doc. 833 ¶ 20; 899 ¶ 96.) In March 2006, Coventry informed HCA Midwest that Heartland was participating as an in-network provider for one of its networks and HCA Midwest was "shocked" because it felt like there was an understanding that Heartland would not be added to Coventry's networks. HCA Midwest told Coventry that HCA Midwest would terminate its provider agreement if Coventry continued to have Heartland as an in-network provider. (Doc. 899 ¶ 103.) However, in an e-mail communication between HCA Midwest and Coventry in August 2006, HCA Midwest informed Coventry that it was "waiving network configuration rights for [Saint Luke's]." (Doc. 899 SI 12.) On June 29, 2007, Coventry terminated Heartland's contract, effective September 1, 2007. (Doc. 899 ¶ 103.)

Other specific examples of direct communications between and amongst present and settled defendants are:

- HCA Midwest communicated to Humana its concerns regarding physician-owned specialty hospitals and that it did not want Humana to contract with physician-owned specialty hospitals. (Doc. 833 ¶ 14.)

- HCA Midwest communicated "to MCOs" that HCA Midwest was opposed to physician-owned specialty hospitals being admitted to the networks. (Doc. 833 SI 25.)

- Saint Luke's communicated with each MCO Defendant that Saint Luke's would not approve of the MCO Defendants allowing Heartland into its network. (Doc. 833 SI 25.)

- Shawnee Mission Medical Center has publicly stated its opposition to the proliferation of specialty hospitals or surgery centers that are not at least fifty-one percent owned by traditional hospitals, at open trade-like meetings. (Doc. 833 SI 42.)

- Cigna testified that it communicated with both Saint Luke's and Shawnee Mission Medical Center that they were concerned about contracting with free-standing facilities that were not at least partially owned by a traditional hospital. (Doc. 899 ¶ 23.)

- United's former director of network management, Laura Kozisek, testified that there was a "gentlemen's agreement," which was United's practice, that other managed care organizations in the Kansas City area were including facilities majority-owned by hospitals in their contracts. Kozisek also testified, however, that she did not know whether other managed care organizations had a "gentlemen's agreement" to allow majority-owned facilities to be included in the contracts being negotiated. Kozisek went on to testify that when she was a Carondelet employee, Carondelet would be able to contract a majority-owned ambulatory surgery center with Coventry because of this "understanding." Kozisek testified that the "understanding" had no relationship to excluding any other [ambulatory surgery center] from getting a

contract with a particular payor. (Doc. 833 ¶ 13.)

- ● Kozisek additionally testified that "kind of the understanding, unwritten but understood" amongst managed care organizations was that managed care organizations would not be extending managed care contracts to specialty hospitals.[19] (Doc. 833 ¶ 13.)

## H. Common Group Associations of Defendants[20]

### 1. Classic Cup Dinners

 In September 2003, September 2004, and September 2005, Saint Luke's hosted marketing dinners at the Classic Cup restaurant for MCOs (hereinafter referred to as the "Classic Cup Dinners"). (Doc. 778 ¶ 50.) Aetna, Blue Cross, Cigna, Coventry, Humana, and United attended the September 2003 Classic Cup Dinner. Aetna, Blue Cross, Cigna, Coventry, and Humana attended the September 2004 Classic Cup Dinner. Aetna, Blue Cross, Cigna, Coventry, Humana, and United attended the September 2005 Classic Cup Dinner. (Doc. 833 ¶ 44; 778 ¶ 50.)

Blue Cross testified that the Classic Cup Dinners included discussion regarding competition from specialty hospitals and that at the 2003 Classic Cup Dinner, there was an acknowledgment of some of the MCOs in attendance that they had not offered contracts to some of the new specialty hospitals or surgery centers. (Doc. 833 ¶ 44.)

Humana testified that at the 2003 Classic Cup Dinner, Saint Luke's "suggested that health plans should not contract with specialty hospitals that were not owned or partially owned by free—by the acute care

---

19. Kozisek testified that she did not learn this through her attendance at the HFMA Meeting. (Doc. 833 ¶ 13.) The HFMA Meeting is discussed in more detail below.

20. Heartland also alleges facts concerning the parties' lobbying activities. The Missouri Hospital Association ("MHA") is a trade associations composed of hospitals in their respective states. The MHA represents and advocates on behalf of hospitals in their respective states, and seeks to educate the public and state legislatures about health care issues. Both the Kansas Hospital Association ("KHA") and the MHA have approached state governments to persuade them to limit the number of specialty hospitals in their respective states. (Doc. 835 ¶ 66.)

HCA Midwest, Saint Luke's, Carondelet, and North Kansas City Hospital are members of the MHA. HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center are members of the KHA. (Doc. 835 ¶ 67.) Each of the hospitals has participated in lobbying efforts at the federal and state levels to enact legislation relating to physician-owned hospitals. (Doc. 835 ¶ 68.)

This information is of little consequence. The legitimate use of the political process by private individuals, even if their intent is to eliminate competition, is exempted from antitrust liability. *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (noting that a "concerted effort to influence public officials regardless of intent of purpose" does not violate the Sherman Act even though intended to eliminate competition); *East. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (holding that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to tackle particular action with respect to a law that would produce a restraint or a monopoly"); *Tal v. Hogan*, 453 F.3d 1244, 1259–60 (10th Cir.2006) (stating that the *Noerr–Pennington* doctrine "exempts from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition"); *GF Gaming Corp. v. City of Black Hawk, Colo.*, 405 F.3d 876, 883–84 (10th Cir. 2005) (discussing same); *see also Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1136–39 (10th Cir.2002) (discussing the trial court's discretion in admitting evidence within *Noerr–Pennington's* scope if that evidence is probative, not unduly prejudicial, and shows "the purpose and character of the particular transactions under scrutiny").

hospitals." (Doc. 899 ¶ 44.) Coventry testified that at the 2005 Classic Cup Dinner, Saint Luke's presentation addressed, among other things, specialty hospitals and joint ventures between hospitals and physicians. (Doc. 852 ¶ 56.)

Humana testified that it recalled hearing Saint Luke's state at a Classic Cup Dinner that it was Saint Luke's preference for managed care plans not to contract with specialty hospitals unless they were partially owned by acute care hospitals. At the Classic Cup Dinners, Saint Luke's presentation included the following statement: "We applaud those payers [sic] who have either refused to add new centers to their networks or have added only those centers that are majority owned by a hospital in their network. . . ." One of the Coventry attendees made a notation on his agenda that health plans and hospitals should agree to add joint ventures but not specialty hospitals. (Doc. 833 ¶ 44.)

## 2. Ingram's Magazine Meeting

On April 19, 2004, local health care industry representatives attended a public meeting co-chaired by Ingram's Magazine, HCA Midwest, and Bryan Cave LLP (hereinafter referred to as the "Ingram's Magazine Meeting"). (Doc. 778 ¶ 48; 835 ¶ 60.) Defendants who attended were: HCA Midwest, North Kansas City Hospital, Saint Luke's, Blue Cross, Coventry, and Humana. (Doc. 833 ¶ 37; 835 ¶ 60.) Aetna, Carondelet and Shawnee Mission Medical Center did not attend the Ingram's Magazine Meeting. (Doc. 778 ¶ 48; 835 ¶ 62; 835 20 14.)

At the Ingram's Magazine Meeting, participants discussed specialty hospitals and their concerns in regard to specialty hospitals. (Doc. 833 ¶ 14; 835 ¶ 60.) North Kansas City Hospital stated that it viewed specialty hospitals as a competitive threat and applauded insurers who planned to keep Heartland out of its network. (Doc.

833 ¶ 14.) HCA Midwest and North Kansas City Hospital expressed their view that competition from specialty hospitals posed a significant threat. (Doc. 833 ¶ 37.) Blue Cross, Coventry, and Humana communicated their commitment not to contract with specialty providers. (Doc. 833 ¶ 37; 899 ¶ 37.)

## 3. HFMA Meeting

On January 27, 2005, local healthcare industry representatives attended a meeting hosted by the Healthcare Financial Management Association ("HFMA"), an accounting organization (hereinafter referred to as the "HFMA Meeting"). (Doc. 778 ¶ 49; 852 ¶ 54.) During the meeting, certain hospital representatives and others in attendance appeared on a panel that addressed health care in Kansas City. (Doc. 835 ¶ 64.) Several topics, including the emergence of specialty hospitals, were discussed. (Doc. 852 ¶ 54.) Defendants who attended the HFMA Meeting were: Coventry, Humana, HCA Midwest, Saint Luke's, Shawnee Mission Medical Center, Carondelet, and North Kansas City Hospital. (Doc. 833 ¶ 38.) Aetna did not attend the HFMA Meeting. (Doc. 778 1 49.)

At the HFMA Meeting, North Kansas City Hospital, HCA Midwest, and Carondelet expressed their views against specialty hospitals. North Kansas City Hospital communicated that it was lobbying to protect the general acute care hospitals from specialty hospitals. (Doc. 833 ¶ 38.) Coventry's representative's notes of the HFMA Meeting state that North Kansas City Hospital discussed "limited services hospitals" and that they "impact community hospitals," "erode[ ] safety net[s]," and "solution—level the playing field" and that HCA Midwest and Carondelet agree with North Kansas City Hospital. (Doc. 899 ! 30.) The notes also state, under the heading "Specialty Hospitals": "when aligned

w/ hospitals—'winner all around' provides competition provides innovation HCA/Carondelet pursuing this ... work cooperatively." (Doc. 899 ¶ 38.)

## I. Motion to Strike

■ As part of the Hospital Defendants' motion for summary judgment, Saint Luke's submitted affidavits from two Saint Luke's employees and an internal e-mail string between the employees.[21] (*See* Doc. 839 Exs. 72, 73, 74.) In relation to these exhibits, Heartland filed a motion to strike and for sanctions (Doc. 897) to which Saint Luke's responded (Doc. 914) and Heartland replied (Doc. 919).

The day before the Hospital Defendants filed their motion for summary judgment, Saint Luke's produced to Heartland an e-mail string discussing Saint Luke's attendance at the Ingram's Magazine Meeting. Both Kerry O'Connor and Corrine Everson were members of the e-mail string. In support of the Hospital Defendants' motion for summary judgment, O'Connor and Everson submitted declarations that O'Connor attended the meeting and e-mailed Everson regarding the meeting, but that O'Connor's attendance or the e-mail were never discussed. O'Connor's declaration was unsigned.

Heartland informs the court that O'Connor and Everson were never disclosed in a Rule 26 disclosure or supplementation, the identities and information within the declarations was responsive to propounded discovery but was not produced, the e-mail string was responsive to discovery but not produced, and Saint Luke's has previously and repeatedly stated that it did not attend the Ingram's Magazine Meeting, despite this new evidence to the contrary.

Heartland requests the following: 1) the O'Connor and Everson declarations be stricken from use at summary judgment (and their testimony be foreclosed at trial) because neither person was disclosed pursuant to Rule 26 or in response to relevant discovery; 2) O'Connor's declaration be stricken because it is unsigned; 3) the e-mail string be stricken from use at summary judgment (and foreclosed from use at trial) because it was responsive to discovery requests dating back to November 2005 but not produced until June 28, 2007; 4) the use of the e-mail string and testimony from these witnesses at summary judgment or trial be foreclosed because their use would be unfair to Heartland because it represents an unreliable reversal of positions from Saint Luke's; 5) Saint Luke's should be sanctioned for its behavior through an award of attorneys' fees and costs as well as a court-ordered stipulation. (Doc. 897.)

Saint Luke's argues in response that Heartland has suffered no prejudice from Saint Luke's failures. (Doc. 914 at 9.) Saint Luke's also filed a motion for leave to submit a signed declaration to substitute O'Connor's unsigned declaration. (Doc. 912.) Heartland responded in opposition (Doc. 923) and Saint Luke's filed a reply (Doc. 927).

A review of the relevant Federal Rules of Civil Procedure is necessary. Rule 26(a)(1)(A) requires initial disclosure of the name and subjects of information of each individual likely to have discoverable information that may be used to support a claim or defense. *See also* (Doc. 242 ¶ II.f (requiring supplementation of Rule 26 disclosures that "identify the universe of all witnesses and exhibits that probably or even might be used at trial")); *Vesom v.*

---

21. The e-mail string also includes communication between Saint Luke's and the apparent organizer of the Ingram's Magazine Meeting.

*Atchison Hosp. Assoc.*, No. 04–2218–JAR, 2006 WL 2714265, at *6 (D.Kan. Sept. 22, 2006) (striking declarations offered at summary judgment because the individuals had not previously been disclosed pursuant to Rule 26; the declarations were being used to support elements of the plaintiff's claim, the court found that failure to disclose was not harmless, and there was no substantial justification for withholding the information). In addition, Rule 33(b)(1) requires interrogatories to be fully answered and Rule 34(b) requires requests for production of documents to be complied with within thirty days.

Regarding Saint Luke's previous testimony on the matter, Rule 30(b)(6) requires a witness designated as a corporate representative to "testify as to matters known or reasonably available to the organization." *See also Starlight Int'l Inc. v. Herlihy*, 186 F.R.D. 626, 638 (D.Kan. 1999) (requiring a Rule 30(b)(6) designee to be adequately prepared to give "complete, knowledgeable and binding answers on behalf of the corporation").

Finally, Rule 56(e) sets forth specific requirements for supporting and opposing affidavits for a motion for summary judgment, including that papers referred to in an affidavit be sworn or certified copies. *See also Flemming v. Corrections Corp. of Am.*, 143 Fed.Appx. 921, 925 n. 1 (10th Cir.2005) (stating that "[a]n unsigned affidavit ... does not constitute evidence under Fed.R.Civ.P. 56(e)"); *Hamilton v. Century Concrete, Inc.*, No. 06–2263–JWL, 2007 WL, 2010938, at *2 (D.Kan. July 9, 2007) (citing *Flemming* in support of its ruling that "[i]n the absence of signatures by either the affiants or the notary, the affiants' statements in this case cannot be considered to have been sworn to or made under penalty of perjury, and the statements cannot be considered in opposition to summary judgment on plaintiff's claims").

In consideration of all the above, the Rules also provide for sanction for practices not in compliance therewith. Rule 37(c)(1) states that:

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.

FED.R.CIV.P. 37(c)(1). To determine the existence of a substantial justification, or the harmlessness of a failure to disclose, a court considers the following factors: 1) the prejudice or surprise to the party against whom the testimony is offered; 2) the ability of the party to cure the prejudice; 3) the extent to which introducing such testimony would disrupt the trial; and 4) the moving party's bad faith or willfulness. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985 (10th Cir.1999).

Saint Luke's argues that Heartland knew of O'Connor's presence at the Ingram's Magazine Meeting as of May 2006 when Ingram's produced records of the same. (Doc. 914 at 2.) Heartland did not advise Saint Luke's of its knowledge of O'Connor's attendance until May 31, 2007, and once Saint Luke's was so informed, it immediately investigated and produced the

information it discovered. (Doc. 914 at 2–3.) Saint Luke's made its disclosure only one day before filing its dispositive motion, but this allowed Heartland sufficient time to formulate its response to Saint Luke's dispositive motion, with the new information included. In addition, trial of this case is not imminent. Saint Luke's did not act in bad faith in its management of the discovery of this matter. Saint Luke's interviewed the key witnesses thought to have information and that information was produced. O'Connor and Everson were understandably thought to not be likely sources of information with regard to this litigation. (Doc. 914 at 10.)

Heartland's motion to strike and for sanctions (Doc. 897) is therefore denied. Saint Luke's motion for leave to file a substitute exhibit (Doc. 912) is granted.

## IV. GENERAL SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—

whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If so, the court cannot grant summary judgment. *Prenalta Corp. v. Colo. Interstate Gas Co.*, 944 F.2d 677, 684 (10th Cir.1991).

## V. ANALYSIS

■ As stated above, Heartland alleges three general claims in this litigation. These claims are: 1) conspiracy to boycott,[22] brought pursuant to the Sherman Act, 15 U.S.C. § 1; 2) tortious interference with a prospective business relationship; and 3) civil conspiracy. (Doc. 249.) The MCO Defendants move for summary judgment on all claims and the Hospital Defendants move for partial summary judgment on the horizontal conspiracy claims[23] included in Heartland's antitrust claim.

### A. Sherman Act, 15 U.S.C. § 1

#### 1. Heartland's Styling of its § 1 Claim

■ Heartland argues that because it has alleged a single conspiracy between and among the Hospital Defendants and the MCO Defendants, it is "entitled on summary judgment to the full benefit of its proof as to this entire conspiracy considered as a whole and without tightly compartmentalizing the various factual components," citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S.

---

**22.** An exclusionary group boycott, even "without a concomitant price-fixing or market allocation agreement," is a violation of the antitrust laws. *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1086 n. 12 (10th Cir.2006).

**23.** *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.").

690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). (Doc. 878 at 2.) In *Continental Ore*, the plaintiff brought suit under §§ 1 and 2[24] of the Sherman Act alleging that multiple defendants had conspired to restrain, by monopolizing, and by attempting and conspiring to monopolize, trade and commerce in various metals that both parties mined. 370 U.S. at 693, 82 S.Ct. 1404. On appeal from a jury verdict for defendants, the Ninth Circuit considered each defendant's conduct separately and affirmed the district court. *Id.* at 698, 82 S.Ct. 1404. The Supreme Court reversed the Ninth Circuit and held that in a case involving an alleged conspiracy among multiple actors and multiple acts:

> plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it as a whole.... [I]n a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it.

370 U.S. at 699, 82 S.Ct. 1404 (internal quotation and citation omitted). The *Continental Ore* passage cited was related to the lower court's determination of a lack of evidence to support a causal connection between the antitrust violations and damages. *Id.* at 700. The lower court had assumed that enough evidence had been presented to show that the defendants committed the acts charged as part of a conspiracy. *Id.* at 697–98, 82 S.Ct. 1404.

The Tenth Circuit has not discussed the exact *Continental Ore* argument urged here. In *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509 (10th Cir.1984), the Tenth Circuit ruled on whether each of the "six things" the plaintiff relied on to prove abuse of monopoly power need be supported by sufficient evidence to find a Sherman Act § 2 violation in a claim under § 2 for monopolization. The circuit cited *Continental Ore* in partial support of its finding that plaintiff's evidence should be viewed as a whole, and each of the six types of anticompetitive conduct need not be supported as long as, taken together, the evidence proved a monopolization claim. *Id.* at 1522 n. 18. This is a different scenario than the one presented here with multiple defendants at two different levels and the attempt to show a conspiracy amongst them, but the case clearly supports Heartland's position.

District courts within the Tenth Circuit have also commented on *Continental Ore* in a similar manner to the *Aspen Highlands Skiing Corp.* case. *See, e.g., Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F.Supp.2d 1048, 1078 (D.Colo.2004) (citing *Continental Ore* and *Aspen Highlands Skiing Corp.* for the finding that the defendant's conduct in a § 2 monopolization claim should be analyzed as a whole, rather than compartmentalized); *United States v. AMR Corp.*, 140 F.Supp.2d 1141, 1218 n. 28 (D.Kan.2001) (citing *Continental Ore* and holding that a § 2 monopolization claim cannot be made because, even collectively, the alleged claims were not sufficient); *In re Independent Serv. Orgs. Antitrust Litigation*, 85 F.Supp.2d 1130, 1158 (D.Kan.2000) (same); *Caldera, Inc. v. Microsoft Corp.*, 72 F.Supp.2d 1295, 1307–09 (D.Utah 1999) (same); *see also Champagne Metals v. Ken–Mac Metals, Inc.*, 458 F.3d 1073, 1081 n. 6 (10th Cir.2006) (commenting that the lower court, on remand, should consider evidence cumula-

---

**24.** Section 2 prohibits monopolies, attempted monopolies, and conspiracies to monopolize.

15 U.S.C. § 2.

tively when determining whether a co-conspirator hearsay exception applies in an antitrust case (citing *Bourjaily v. United States*, 483 U.S. 171, 179–80, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987))).

Courts outside this circuit have dealt with tangential issues as well. One court has found that it is appropriate to apply *Continental Ore* when considering a motion to compel arbitration of part of a conspiracy claim which would have the effect of compartmentalizing the plaintiffs' single conspiracy claim. *Jung v. Ass'n of Am. Medical Colleges*, 300 F.Supp.2d 119, 154–56 (D.D.C.2004) (the single conspiracy had three interacting prongs that when considered together had the anticompetitive effect charged). The *Jung* court cited cases holding that the ramification and effect of a conspiracy should be evaluated as a whole, that the totality of factors should be viewed in determining whether an agreement or conspiracy exists, and that defendants should not be permitted to sever plaintiffs' claims of conspiracy by alleging multiple conspiracies rather than one. *Id.* at 155–56 (citing *In re Consumer Credit Counseling Servs. Antitrust Litigation*, Nos. MDL 97MS233 (RMU), 97–CV–1741, 1997 WL 755019 (D.D.C. Dec.4, 1997), *In re Medical X–Ray Film Antitrust Litigation*, 946 F.Supp. 209, 218 (E.D.N.Y.1996), and *In re Vitamins Antitrust Litigation*, No. 99–197(TFH), 2000 WL 1475705 (D.D.C. May 9, 2000)).

Aetna cites cases dealing with criminal conspiracy indictments that are not directly on point to the antitrust issue at hand. *See, e.g., Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (holding that it was error for the trial court to try together multiple defendants from an indictment that charged a single conspiracy when the proof showed multiple separate conspiracies whose members were unknown to each other, although one key figure was a party to each); *United States v. Butler*, 494 F.2d 1246, 1248–49 (10th Cir.1974) (holding that, as to one defendant in a twenty-three person indictment of conspiracy, the evidence was insufficient to support an agreement to enter the conspiracy). Both *Kotteakos* and *Butler* involved, what the evidence ultimately showed to be, multiple conspiracies. No such claim has been made in this case. Neither case stands for Aetna's proposition that it would be a violation of Aetna's due process rights for the court to consider evidence relating to the other defendants.

Aetna cites one antitrust conspiracy case, *Alexander v. Phoenix Bond & Indem. Co.*, 149 F.Supp.2d 989 (D.Ill.2001), in support of its contention that the court should only consider evidence which is admissible to Aetna. However, the full passage Aetna contends supports its position states:

> [The court] will analyze each defendant individually because, even in a conspiracy case, liability remains individual and is not a matter of mass application. *Kotteakos v. United States*, 328 U.S. 750, 772, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). However, plaintiff's best argument is simply that the major players ... must have conspired for this sale to have unfolded in the way that it did. Therefore, plaintiffs are appealing to something else the Supreme Court stated in *Kotteakos*, namely, 'when many conspire, they invite mass trial by their conduct.' *Id*, at 773, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. By analyzing the individual evidence brought against each defendant, we will attempt to balance these concerns.

*Id.* at 1000. The court in *Alexander* then looked at each defendant to determine if there was evidence to exclude the possibility of independent action. *Id.* The court, however, also discussed the evidence as to

multiple defendants when that evidence was interrelated. *Id.* at 1002.

After consideration of the above cases, the court finds that the approach most in line with the *Continental Ore* directive is to consider all the evidence presented by Heartland. Nevertheless, each defendant must be shown to have participated in the conspiracy alleged, and the court will consider, from all the evidence, whether Heartland has met its burden in this regard.

### 2. Standards of Law and Summary Judgment on a § 1 Claim

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States...." 15 U.S.C. § 1. The underlying concern governing federal antitrust law is the protection of competition, not individual competitors. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* — U.S. ——, 127 S.Ct. 2705, 2724, 168 L.Ed.2d 623 (2007) (citing *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)); *Reazin v. Blue Cross & Blue Shield of Kan.,* 899 F.2d 951, 960 (10th Cir.1990) ("[T]he adverse impact must be on *competition,* not on any individual competitor or on plaintiff's business.").

■ To recover under § 1, a plaintiff must prove: 1) a contract, combination, or conspiracy; 2) a resultant unreasonable restraint of trade in the relevant market; and 3) an accompanying injury. *Full Draw Productions v. Easton Sports, Inc.,* 182 F.3d 745, 756 (10th Cir.1999) (citing *TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022 (10th Cir.1992)). The alleged restraint of trade is a group boycott. *See id.*

at 750–51 (describing the contours of a group boycott and the illegality of same). Defendants move for summary judgment on Heartland's § 1 claim,[25] alleging that Heartland has not met its initial burden of showing an agreement to restrain trade.

■ Section 1 does not reach unilateral action of individuals, and requires an actual concert of action between separate entities. *Fisher v. City of Berkeley,* 475 U.S. 260, 266–67, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). A conspiracy, by definition, involves "two or more entities that previously pursued their own interests separately ... combining to act as one for their common benefit." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). A plaintiff must show "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (internal quotation omitted). "The essence of a claim of a violation of Section 1 of the Sherman Act is the agreement itself. Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade." *Champagne Metals v. Ken–Mac Metals, Inc.,* 458 F.3d 1073, 1082 (10th Cir.2006) (internal citations and quotations omitted).

■ In general, consciously parallel behavior is insufficient to prove a conspiracy. *In re Universal Serv. Fund Telephone Billing Practices,* 300 F.Supp.2d 1107, 1146 (D.Kan.2003). "Parallel behavior may, however, suggest that an illegal agreement exists when accompanied by a so-called 'plus factor'—that is 'additional evidence from which an understanding among the parties may be inferred.'" *Id.*

---

**25.** The Hospital Defendants move for summary judgment only on those portions of Heartland's antitrust claims that involve a horizontal conspiracy amongst the Hospital Defendants.

(quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir.1999)). "Such evidence may include a showing that the parties are acting against their own individual business interests, or that there is motivation to enter into an agreement requiring parallel behavior." *Mitchael*, 179 F.3d at 859. The Supreme Court recently summarized how parallel behavior may be considered in a Sherman Act § 1 claim:

> Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful.
>
> The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.

*Bell Atl. Corp. v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (internal citations, quotations and alterations omitted).

The Supreme Court in *Twombly* gave examples of parallel conduct allegations that would be "plausible grounds to infer an agreement" at the *pleading* stage of a § 1 antitrust claim: "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties;" "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement;" and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Id.* at 1965 n. 4 § internal quotations and citations omitted.

Because of these limitations on the reach of a § 1 claim, a business retains the right under § 1 to unilaterally announce the terms on which it will deal and refuse to deal with those who will not comply. *Monsanto*, 465 U.S. at 760, 104 S.Ct. 1464 ("Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."). Unilateral conduct, regardless of its anticompetitive effects, is not prohibited. *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1200 (10th Cir.2006). "A manufacturer's exclusion of a buyer-distributor in response to another buyer-distributor's complaints in insufficient as a matter of law to establish a conspiracy." *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1259 (10th Cir.2006). The plaintiff must show more than complaints or that action was in response to complaints to show a conspiracy. "Something more than mere acquiescence to a competitor's complaints about a price-cutter" must be present to infer a conspiracy. *Id.* at 1262.

██ The challenged agreement giving rise to a conspiracy need not be in writing or be explicit, and may be established by direct or circumstantial evidence. *See Twombly*, 127 S.Ct. at 1964 (stating that

the agreement may be "tacit or express"); *see also Mitchael,* 179 F.3d at 856–57 ("[T]o survive defendants' motion for summary judgment, the plaintiffs must first demonstrate the existence of an agreement, whether by direct or by circumstantial evidence.").

■ Here, Heartland has alleged both direct and circumstantial evidence of an agreement. (Doc. 833 at 39–40.) "Direct evidence in a Section 1 conspiracy case must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Champagne Metals,* 458 F.3d at 1083 (quoting *In re Baby Food Antitrust Litigation,* 166 F.3d 112, 118 (3d Cir.1999)). "With direct evidence the fact finder is not required to make inferences to establish facts." *Id.* The existence of direct evidence alters both a plaintiff's burden and the court's determination of summary judgment issues. If a plaintiff produces direct evidence of an agreement, it is not required, in addition, to adduce circumstantial evidence which tends to exclude the possibility of independent action or the economic plausibility of its claim. The court is not required to consider these matters or whether a defendant's economic motive was rational. *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 466, 469 (3d Cir.1998). The presence of direct evidence does not preclude a plaintiff from adducing, or the court from considering, circumstantial evidence of an agreement.

■ "Circumstantial evidence may support the existence of an illegal § 1 agreement. However, on summary judgment, antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Champagne Metals,* 458 F.3d at 1085. Circumstantial evidence must be sufficient to support an inference that defendants acted in concert and not independently. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he acceptable inferences which we can draw from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the danger associated with such inferences." *Champagne Metals,* 458 F.3d at 1085.

In the face of ambiguous circumstantial evidence of an agreement, an antitrust plaintiff must come forward with "evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348 (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. 1464). The Tenth Circuit has stated:

> *Matsushita,* then, establishes a two-part inquiry for evaluating the propriety of summary judgment in an antitrust conspiracy case: (1) is the plaintiff's evidence of conspiracy ambiguous, *i.e.,* is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.

*Gibson v. Greater Park City Co.,* 818 F.2d 722, 723–24 (10th Cir.1987). "In other words, if the evidence is as consistent with permissible independent business interests as with an illegal conspiracy, then the plaintiff fails to create a fact issue on the existence of a section one conspiracy *unless* the ambiguity is negated by evidence tending to exclude the possibility that the defendants were pursuing independent interests." *Key Financial Planning Corp. v. ITT Life Ins. Corp.,* 828 F.2d 635, 639 (10th Cir.1987). Courts "turn first to the question of ambiguity, then to whether any evidence tends to negate the possibility of legitimate business interests." *Id.*

■ When a plaintiff alleges only circumstantial evidence of an agreement, the range of inferences that can be drawn

from that evidence is directly related to the strength of the proffered economic theory of the claim. *See Champagne Metals,* 458 F.3d at 1084 (stating that it is "undoubtably true" that in a circumstantial evidence case, "the more economically rational a conspiracy is in a given situation, the broader the range of inference that can be drawn from the evidence"). "[T]he plausibility of an antitrust plaintiff's claim is important. If the factual context renders the plaintiff's claim implausible—if the claim is one that simply makes no economic sense—a plaintiff must come forward with more persuasive evidence to support its claim than would otherwise be necessary." *Abraham,* 461 F.3d at 1257 (quoting *Rossi,* 156 F.3d at 466) (internal quotations and citations omitted); *see also Mitchael,* 179 F.3d at 858 ("Thus, the acceptable inferences which we can draw from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the danger associated with such inferences." (internal quotation omitted)). "Relatedly, in evaluating whether a genuine issue for trial exists, the antitrust defendant's economic motive is highly relevant. If the defendants had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Abraham,* 461 F.3d at 1257–58.

The court now turns to analysis of Heartland's § 1 claim, to determine if, from all the evidence shown, Heartland has "demonstrate[d] that there is any factual dispute about the existence of any illegal agreement." *Mitchael,* 179 F.3d at 858; *see also Champagne Metals,* 458 F.3d at 1082 ("Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade." (quoting *AD/SAT, Div. Of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 232 (2d Cir.1999))).

### 3. Analysis of Heartland's § 1 Claim

Heartland alleges both direct and circumstantial evidence of an agreement between the MCO Defendants and the Hospital Defendants to boycott Heartland.

#### a. Direct Evidence

Heartland alleges the following is direct evidence of an agreement:

1) Kozisek's testimony that "kind of the understanding, unwritten but understood" amongst MCOs was that MCOs would not be extending managed care contracts to specialty hospitals;

2) Kozisek's testimony that there was a "gentlemen's agreement," which was United's practice, that other MCOs in the Kansas City area were including facilities majority-owned by hospitals in their contracts;

3) MCO Defendants' network configuration agreements with Hospital Defendants that excluded physician-owned specialty hospitals while permitting competing hospitals to add new facilities to networks;

4) Coventry's coordination with HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to get them to agree and be cooperative with each other concerning network configuration language;

5) Blue Cross's statement that "managed care organizations like Blue Cross would not contract with Heartland because Blue Cross had agreed with its member hospitals in the Kansas City area not to contract with physician-owned facilities like Heartland;" and

6) Aetna's proposal of language in the draft of the 2004 Aetna–HCA Midwest amendment that if HCA Midwest did not have the same or substantially similar network configuration clause in all its major payor agreements (*i.e.,* those with

Aetna, Blue Cross, Cigna, Coventry, and Humana), or did not enforce such a provision, then Aetna could request and HCA Midwest shall either bring the payor into compliance or release Aetna from its network configuration obligation.

(Doc. 833 at 32.)

The first of the alleged direct evidence concerns Laura Kozisek's testimony. Kozisek testified that "kind of the understanding, unwritten but understood," was that MCOs would not be extending managed care contracts to specialty hospitals. A recent Tenth Circuit case, *Champagne Metals*, cited for its summary of the relevant standards of law above, has discussed what it found to be sufficient direct evidence of an agreement in a § 1 conspiracy claim. In *Champagne Metals*, the plaintiff, an aluminum distributor, claimed that defendants, older and more established distributors, conspired to exclude it because it was a new competitor. 458 F.3d at 1076. The plaintiff alleged that the established distributors threatened suppliers that they would move their business from the suppliers that agreed to deal with the plaintiff. The plaintiff attempted to prove this conspiracy through both direct and circumstantial evidence. The district court found that none of the statements offered as direct evidence clearly indicated an agreement, that the plaintiff's theory of conspiracy was, at best, plausible but weak, and that the circumstantial evidence did not tend to support concerted action. *Id.* at 1077–78.

On appeal, the Tenth Circuit reversed the district court's order granting summary judgment on the antitrust claims and remanded the case. The court concluded that the plaintiff did adduce direct evidence of an agreement but that it was "weak direct evidence." *Id.* at 1084. The court then found that the alleged conspiracy was economically rational and remanded the matter for the district court to evaluate the circumstantial evidence in light of the "highly plausible economic theory," "combined with [the plaintiff's] direct evidence." [26] *Id.* at 1087.

Turning first to the court's discussion of direct evidence, in a footnote the court disagreed with two statements that the plaintiff contended were direct evidence of an agreement. The first was a statement from an established distributor to the plaintiff that the established distributor could get the other established distributors together "to make it happen." The court characterized this statement as, "at best," an implication that there would be collective action. The second was a statement by an established distributor to a supplier that it wished the supplier would not deal with the plaintiff, that the established distributor had been in touch with her counterparts and her counterparts were not happy with the supplier dealing with the plaintiff, and that because of their clout, the supplier would have to listen to them. The court characterized this statement as "perhaps an admission that the [established] service centers individually would attempt to force [a mill] to stop dealing with [the plaintiff]" but that the statement contained "no suggestion of any agreement between the service centers." Ultimately, the court stated that it agreed with the lower court's determination that both statements "lack the requisite clarity to constitute direct evidence." *Id.* at 1083 n. 8.

**26.** On remand, the district court held that the defendants were not entitled to summary judgment on either the plaintiffs § 1 *per se* illegal group boycott claim or the plaintiff's tortious interference claim. *Champagne Metals v. Ken–Mac Metals, Inc.,* No. CIV–02–0528–HE, 2007 WL 4115994 (W.D.Okla. July 27, 2007).

The court agreed that the following was direct evidence of collusive action: a statement by an established distributor to a supplier that the relationship between the supplier and the plaintiff was damaging to the industry as a whole and that the established distributor and other distributors in that area would buy from other suppliers.[27] The court characterized this statement as "explicit" evidence of an agreement. The court decided, however, that the statement alone was not enough for the case to survive summary judgment because the statement did not indicate which, if any, of the established distributors were part of the agreement. Thus the court characterized the statement as "weak direct evidence." The court determined that additional circumstantial evidence would be required to overcome a motion for summary judgment. *Id.* at 1083–84.

After making this finding, the court proceeded to evaluate the plaintiff's circumstantial evidence. The court first noted that "when a plaintiff makes out a case based only on circumstantial evidence," then "the more economically rational a conspiracy is in a given situation, the broader the range of inferences that can be drawn from the evidence." The court found that the plaintiff's theory that the established distributors "acted together to attempt to keep a new, aggressive entrant out of the market" was economically rational based on fears of new competitors eroding profit margins or fears of losing market share. *Id.* at 1084–86.

A case relied upon by the Tenth Circuit in *Champagne Metals* is also pertinent to the analysis here. In *Rossi v. Standard Roofing, Inc.,* the plaintiff, a roofing distributor, alleged that the defendants, other roofing dealers and a supplier, engaged in a group boycott against the plaintiff. 156 F.3d 452, 456 (3d Cir.1998). The district court granted the defendants' motions for summary judgment and the Third Circuit reversed.

The Third Circuit found the following to be direct evidence sufficient to withstand the defendants' motion for summary judgment: a statement to the plaintiff that if the plaintiff went into business, that a competitor and another competitor "would do anything they could, stop supplies, cut the prices, whatever they had to do they were going to do to keep [the plaintiff] out of business." *Id.* at 468. The court stated that the "threat, viewed in a light most favorable to [the plaintiff], indicates that two of [the plaintiff's] competitors had discussed and agreed to act jointly to prevent [the plaintiff] from competing with them in the roofing and siding business.... Moreover, [the] statement even details how the two companies planned to do it; they agreed to 'stop supplies' anyway they could." *Id.* at 468.

The Third Circuit concluded that this direct evidence, along with: 1) circumstantial evidence of two meetings between the competitors at which prices were discussed and the competitors "actively considered fixing prices;" and 2) "high pressure recruitment, monitoring, and enforcement tactics undertaken by [the competitors] in furtherance of their efforts to prevent [the

---

**27.** The quoted language is: "[an employee of a supplier] claimed that [an employee of an established distributor] told him that the relationship between [the supplier] and [plaintiff] was damaging to the industry as a whole and that [the employee of the established distributor] 'felt that by our participation with [plaintiff], *that himself and other potential customers* within the industry would find that Common-wealth selling to Champagne, *they*-they would find that as, again, not in the best interest of the industry and *would cause other distributors* in that area of the country *to source their metals from other mill sources,* and that by developing a relationship with Champagne Metal, we would be putting other business with potential customers at risk.'" *Id.* at 1083.

plaintiff] from purchasing roofing materials", was enough to survive a motion for summary judgment. *Id.* at 469–72.

 These cases are instructive to the court's analysis of Kozisek's testimony. Kozisek testified that there was an unwritten understanding that MCOs would not be extending managed care contracts to specialty hospitals, which, of course, would keep Heartland from obtaining in-network contracts. No inference is needed to support a finding of an agreement from this testimony. An unwritten understanding is clearly an agreement. *See Twombly,* 127 S.Ct. at 1964 (stating that an agreement may be "tacit or express"). The managed care organizations are clearly separate entities. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (citing 15 U.S.C. § 7's definition of "person" to include corporations and associations). The action of not extending contracts is the alleged boycott. *See* 15 U.S.C. § 1 (forbidding agreements "in restraint of trade").

Kozisek's testimony that MCOs had agreed not to let specialty hospitals participate in their networks is similar to the direct evidence in *Rossi* that two competitors would do what they needed to do to keep the plaintiff out of business. Although it is possible to construct ambiguity in almost any statement, the defendants do not offer any other discrete interpretation of Kozisek's statement that would move it out of the category of direct evidence and into the category of circumstantial evidence. Viewed in the light most favorable to Heartland, this testimony indicates an agreement among MCOs to work collectively to exclude Heartland.

Like the statement in *Champagne Metals,* however, Kozisek's testimony is best characterized as "weak direct evidence." [28] Kozisek does not identify who was included in the unwritten understanding amongst the "managed care organizations." Direct evidence, alone, when weak, does not defeat summary judgment, and "additional circumstantial evidence is required." *See Champagne Metals,* 458 F.3d at 1084 (finding that weak direct evidence does not meet a plaintiff's burden in responding to a motion for summary judgment).

As previously noted, Heartland has cited other examples of what it contends constitute direct evidence of an agreement. The court disagrees that the evidence is direct. Instead, for the following reasons, the court finds the evidence to be circumstantial.

First, Kozisek's testimony regarding a "gentlemen's agreement" among "managed care organizations in the Kansas City area" that the managed care organizations would include facilities majority owned by hospitals in their contracts is not direct evidence of concerted action to boycott Heartland. The testimony explicitly shows only that the managed care organizations agreed that they would give in-network contracts to hospital majority-owned facilities. The court will treat this testimony, therefore, not as direct evidence, but as circumstantial evidence of an agreement.

Second, MCO Defendants' network configuration agreements with Hospital Defendants that exclude physician-owned specialty hospitals while permitting competing hospitals to add new facilities to networks is not direct evidence of a conspiracy. The network configuration agreements explicitly show only that a sin-

---

**28.** Even if the court did not characterize Kozisek's testimony as weak direct evidence, her testimony is certainly circumstantial evidence of an agreement amongst MCO Defendants. Combined with the economic motive and additional circumstantial evidence discussed below, the court's ultimate conclusions herein would remain unchanged.

gle MCO Defendant had a network configuration agreement with a single Hospital Defendant. The fact that the network configuration agreements are similar is not direct evidence of an agreement amongst the MCO Defendants or the Hospital Defendants. This is an example of "parallel business behavior" which the court will treat as circumstantial evidence. *See Twombly*, 127 S.Ct. at 1964 (stating that a showing of parallel business behavior is admissible circumstantial evidence of an agreement).

Third, Coventry's coordination with HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to get them to agree and be cooperative with each other concerning network configuration language is not direct evidence of a conspiratorial agreement. The facts show that Carondelet initiated contact with Coventry asking for its hospital majority-owned facility to be included in Coventry's network. Coventry then contacted HCA Midwest, Shawnee Mission Medical Center, and Saint Luke's to discuss network configuration language. Although Coventry contacted each of the hospitals separately, it is clear that Coventry was seeking coordination of all three hospitals in order for Coventry to comply with Carondelet's request. However, for this testimony to be evidence of an agreement to boycott Heartland, an inference would have to be made that by agreeing to include a hospital majority-owned facility, a tacit agreement was also made to exclude those facilities not majority owned by hospitals. Direct evidence does not require inferences. As such, this evidence will be considered as circumstantial evidence below.

Fourth, Blue Cross's statement that "other managed care organizations like Blue Cross" would not contract with Heartland because Blue Cross had agreed "with member hospitals in the Kansas City area" to not contract with physician-owned facilities is no more than an acknowledgment of the individual relationships previously mentioned. Again, an inference is required to consider this evidence of concerted action among the defendants in this case.

Finally, the court considers Aetna's proposal of language in the draft of the 2004 Aetna–HCA Midwest amendment that if HCA Midwest did not have the same or substantially similar network configuration clause in all its major payor agreements (*i.e.*, those with Aetna, Blue Cross, Cigna, Coventry, and Humana), or did not enforce such a provision, then Aetna could request and HCA Midwest would be required to bring the payor into compliance or release Aetna from its network configuration obligation. Heartland does not contend that Aetna and HCA Midwest actually agreed to Aetna's proposal. Again, this is not direct evidence but will be considered as circumstantial evidence.

A detailed review of Heartland's circumstantial evidence now is necessary. First, however, the court must review Heartland's theory regarding the economic motive of the conspiracy, to determine the inferences that may be drawn from the circumstantial evidence.

### b. Economic Motive

██ Heartland's economic theory is straightforward, and not novel. Heartland opines that the Hospital Defendants engaged in the alleged conspiracy "to respond to the competitive threat that Heartland and other specialty hospitals posed." (Doc. 833 at 33.) Heartland then alleges that each MCO Defendants' participation in the conspiracy served to assure the MCOs that competitor MCOs would not have a more attractive network of physicians and facilities to sell to employers should Heartland be included in a competitors' network. (Doc. 833 at 33.) By

working together with the Hospital Defendants to exclude Heartland, the MCO Defendants were able to negotiate lower reimbursement rates to the hospitals.

The court finds this to be a plausible economic theory. In *Champagne Metals* the Tenth Circuit stated:

> The gravaman of [the plaintiff's] theory is that the [defendants] acted together to attempt to keep a new, aggressive entrant out of the market. There are several reasons why such behavior would be economically rational. For example, the established market participants could fear that an additional competitor would erode the profit margin available to the [defendants]. Or the established market participants might fear losing market share to the new market entrant, particularly an aggressive new entrant like [the plaintiff]. As one commentator has observed, where the 'victim' of an exclusionary group boycott is a competitor of the alleged conspirators, there is no mystery as to why the defendants would want to injure the rival. It is axiomatic that firms prefer to have fewer rather than more rivals.

458 F.3d at 1086 (internal citations, quotations, and alterations omitted). Applying *Champagne Metals'* analysis, Heartland's theory is that the Hospital Defendants sought to keep a highly competitive new entrant from the market to protect their market shares and profitability. The Hospital Defendants preferred to have fewer competitors so that they could protect their profitability and market share.

Then, Heartland's theory continues, in exchange for the MCO Defendants' cooperation and participation, the Hospital Defendants agreed to lower reimbursement rates from the MCO Defendants. An MCOs profitability appears to be dependent on two factors: recruiting employer groups to subscribe to the MCO's network and negotiating the lowest possible reimbursement rates to be paid to the hospitals in the MCO's network. Both factors are at play in Heartland's theory. Without the cooperation of competitor MCOs, an individual MCO runs the risk of another MCO contracting with Heartland and having a more attractive network to an employer § because of the network's broader scope. Reimbursement rates are the MCOs' bargaining chip in their negotiations with the Hospital Defendants: MCO Defendants can obtain lower reimbursement rates by agreeing to include the network configuration clauses in their provider agreements.[29]

Heartland's economic theory leaves little to be interpreted and defendants make no serious effort to dispute it. The discussion in *Champagne Metals* coupled with the facts in this case persuades the court that Heartland's theory is economically rational.

### c. Circumstantial Evidence

The facts outlined in the court's factual recitation above, though voluminous, boil down to the following:[30]

- Heartland was a new, and attractive, healthcare facility in the Kansas City provider market.

---

**29.** At oral argument, Coventry framed Heartland's economic theory as economically implausible because it would have been impractical for the MCOs to keep a lower cost, higher quality, specialty hospital out of the MCOs' networks. This, of course, ignores the rate concessions the MCO Defendants received from the Hospital Defendants in exchange for excluding Heartland.

**30.** These facts are either uncontroverted or, if controverted, taken in a light most favorable to Heartland.

- Initially, the MCO Defendants gave Heartland positive feedback.
- The Hospital Defendants became concerned about their profitability because of the emergence of freestanding facilities.
- The Hospital Defendants recognized that specialty hospitals were a competitive threat.
- The Hospital Defendants recognized Heartland as a competitor.
- The Hospital Defendants met and discussed the competitive threat caused by specialty hospitals.
- The Hospital Defendants openly expressed their desires at public gatherings in which the MCO Defendants were present. At these public meetings, the Hospital Defendants stated their determination that the way to protect their profit margins was for the MCO Defendants not to contract with freestanding facilities.
- The Hospital Defendants individually complained about freestanding facilities to the MCO Defendants. In addition, the Hospital Defendants directly communicated their desire to the MCO Defendants that the MCO Defendants keep specialty hospitals out of the MCO Defendants' networks.
- The Hospital Defendants expressed their desires to each other (i.e., to their competitors).
- The MCO Defendants communicated to each other (i.e., to their competitors) about their strategies.
- The Hospital Defendants negotiated network configuration language in their provider agreements.
- The MCO Defendants agreed to the addition of network configuration language in their provider agreements and in exchange paid lower reimbursement rates to the Hospital Defendants. The Hospital Defendants agreed to reduced payment rates in exchange for the MCO Defendants keeping specialty hospitals out of their networks.
- The MCO Defendants refused to enter into a provider agreement with Heartland.
- The MCO Defendants did not perform a network need analysis prior to making their contract decisions.
- There was a market need for Heartland for orthopaedic and neurosurgery needs and it was not rational for the MCO Defendants to keep Heartland out of MCO networks based on network need.
- Coventry and the Hospital Defendants worked together to allow hospital majority-owned freestanding facilities into the MCO Defendants' networks. The Hospital Defendants agreed to allow their competitors to get in-network contracts and to forego renegotiating higher rates from the MCO Defendants. The Hospital Defendants worked together to allow their own competitors to have freestanding facilities.

These facts, even without considering Kozisek's testimony as "weak direct evidence" but as circumstantial evidence, combined with Heartland's plausible economic theory and defendants' economic motives, supports denial of the motions for summary judgment.

Additional cases within the Tenth Circuit concerning claims under § 1, based solely on circumstantial evidence, are instructive. In *Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir.1999),[31] the plain-

---

**31.** In *Mitchael,* the plaintiffs attempted to allege direct evidence of a conspiracy, but, based on certain evidentiary findings, this direct evidence was not analyzed by the district court, a decision the Tenth Circuit affirmed on appeal. *Id.* at 858.

tiffs, chiropractors, filed suit against insurance companies, alleging the insurers violated § 1 by fixing prices. The district court granted summary judgment for defendants and the Tenth Circuit affirmed. *Id.* at 850.

The chiropractors alleged that consistency of behavior by the insurers, and consistency of outcomes by the insurers' reviews of the chiropractors' claims, demonstrated consistency of action sufficient to support the existence of an agreement. Attempting to show more than this parallel behavior, the chiropractors additionally argued that a plausible economic theory was present based on the insurers' motivation to reduce costs. The Tenth Circuit found that the evidence showed that an agreement would have made little economic sense from the insurers' perspective and ultimately found that the chiropractors failed to meet the *Matsushita* standard. *Id.* at 858–60.

Heartland offers more than the chiropractors' showing in *Mitchael*. Heartland has shown consistency of behavior by the Hospital Defendants and the MCO Defendants. In addition, Heartland has shown a plausible economic theory based on the Hospital Defendants' desire to protect their market share and profits and the MCO Defendants' desire to negotiate reduced payments while maintaining networks similar to their competitors. These additional facts bring Heartland's claim within the *Matsushita* standard.

In *Reazin v. Blue Cross & Blue Shield of Kan.,* 899 F.2d 951 (10th Cir.1990), the plaintiff was a hospital whose corporate parent also participated in the health care financing field. The plaintiff alleged that the defendant MCO agreed with two of the

plaintiff's hospital competitors to terminate the plaintiff's provider agreement and reduce the maximum allowable payments[32] made to the competitors. The plaintiff claimed this was done in effort to increase the plaintiff's cost of doing business and cause a shift of patients from the plaintiff to the competitors, all in response to the perceived competitive threat to the defendant from the plaintiff. On consideration of post-trial motions, the district court entered judgment for the plaintiff pursuant to a jury finding that the defendants had engaged in conspiratorial restraint of trade, and the Tenth Circuit affirmed. *Id.* at 954–55.

The court found sufficient circumstantial evidence supported the jury's finding of an agreement: 1) a series of meetings between the defendant and the competitor hospitals that established an existing forum wherein discussions relating to the plaintiff's termination and the maximum allowable payment reduction took place; 2) testimony that the decisions to cancel the plaintiff's provider agreement and to seek reduced maximum allowable payments from the competitor hospitals were related; 3) a memorandum from one of the competitor hospitals to the defendant which indicated that the decision to terminate the plaintiff and the decision to reduce the maximum allowable payments were interrelated and part of a common scheme to increase the plaintiff's costs of doing business and to drain patients from the plaintiff to the competitor hospitals. *Id.* at 963–64. The court concluded that "sufficient evidence supports a finding of a conscious commitment to a common scheme sufficient to satisfy section 1's re-

---

**32.** In *Reazin,* the Tenth Circuit defined maximum allowable payments as the maximum allowable payment paid from the MCO to the hospital provider for each service provided by the hospital provider to the insureds. *Id.* at

957 n. 7. The court believes the maximum allowable payments are similar to the negotiated payment rates present in the provider agreements in this case.

quirement of an agreement." *Id.* at 964 (internal citations and quotations omitted).

The facts of this case are very similar to the facts of *Reazin*.[33] Again, Heartland has shown more, however. Heartland not only shows what was found to be sufficient evidence of an agreement in *Reazin* (*i.e.*, an existing forum wherein discussions relating to the exclusion of specialty hospitals took place, a relationship between the exclusion of Heartland from the MCO Defendants' networks and the reduced rates paid to Hospital Defendants, and communications from the Hospital Defendants to the MCO Defendants indicating the relationship), but Heartland additionally shows that the Hospital Defendants worked with each other (despite being competitors) to ensure that the network configuration language they had negotiated would not keep each other from having their own hospital majority-owned facilities from obtaining provider agreements with the MCO Defendants.

There is a recent Tenth Circuit case which, at first blush, seems to support defendants' motions. In *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249 (10th Cir.2006), the Tenth Circuit considered an § 1 group boycott claim based solely on circumstantial evidence. The *Abraham* plaintiffs, optometrists, filed suit against a managed care company and two ophthalmologists, alleging, in pertinent part, an agreement between the managed care company and the ophthalmologists to exclude the plaintiffs from the managed care company's networks. *Id.* at 1253–54. The district court granted summary judgment to the defendants based on its finding that the plaintiffs had failed to establish the existence of a conspiracy. *Id.* at 1256.

The Tenth Circuit affirmed. At the outset, the court stated: "Of course, if [the managed care company] acted independently in excluding optometrists, [the managed care company] would not be liable under § 1." *Id.* at 1256. The court additionally noted, however, that "[t]here is also no dispute that if panel ophthalmologists conspired with each other and then with [the managed care company] to restrain trade, then such conduct is actionable under § 1." *Id.* at 1257.

The court found the following facts to be insufficient to survive the *Matsushita* standard: 1) ophthalmologists had a long history of opposing optometrists and opposed legislation pertaining to optometrists; 2) ophthalmologists vigorously discouraged the managed care organization from paneling optometrists and urged the managed care company to panel only ophthalmologists; 3) the managed care company chose not to panel the optometrists based on the opposition of the ophthalmologists. *Id.* at 1258. The court held that "simply because [the managed care company] acted in response to ophthalmologists' complaints is not enough to establish the concerted action requirement." *Id.* at 1259.

The court went on to find that the plaintiffs' additional evidence, offered in attempt to exclude the possibility that the managed care company was acting independently and not pursuant to an agreement with the ophthalmologists, was also insufficient: 1) optometrists are a lower-cost alternative for the managed care company; 2) the managed care company had a motive to conspire with the ophthalmologists based on a quid pro quo relationship with the ophthalmologists; and 3) the managed care company has paneled other providers without privileges at its hospi-

---

**33.** At oral argument, the Hospital Defendants attempted to distinguish *Reazin* on the basis of whether that court was considering a *per se* or rule of reason antitrust claim. At this point, the court finds evidence of an agreement regardless of the styling of the antitrust claim.

tals. *Id.* at 1260–61. The court found that the managed care company had provided a legitimate rationale for its decision, based, in part, on the financial benefits of the managed care company's use of selective contracting. *Id.* at 1261. The court assessed the evidence as follows:

> Here, the record reflects that [the managed care company] prefers to panel health care providers who have staff privileges at [its] hospitals. Ophthalmologists, by law, can perform more procedures than optometrists. Therefore, even if [the managed care company] were to include optometrists on its provider panels, it would still need to panel ophthalmologists. This fact, coupled with [the managed care company's] procompetitive justification for limiting the number of paneled health care providers-that is, limiting the number of providers performing a given service increases the volume of patients each provider sees, which, in turn, enables [the managed care company] to negotiate lower reimbursement rates to the panel providers-suggests that [the managed care company] may have acted independently in deciding not to panel optometrists....

*Id.* at 1263. The Court went on to hold that:

> Although it is tempting to treat the Plaintiffs' evidence in this case as sufficient evidence of a conspiracy to survive summary judgment, the only permissible inference to be drawn from it is that [the managed care company] responded to the ophthalmologists' complaints by deciding not to panel optometrists. There is no evidence to suggest that the ophthalmologists threatened a mass resignation, that the ophthalmologists conditioned their rates on the exclusion of the optometrists, or that the ophthalmol-

ogists in any way coerced [the managed care company] to exclude optometrists. In the absence of these types of "plus" factors, to permit an inference of antitrust conspiracy on the basis of [the managed care company's] response to complaints and thus to expose the defendant to treble damage liability, would both inhibit management's exercise of independent business judgment and emasculate the terms of the Sherman Act.

*Id.* at 1263 (internal quotations and citations omitted).

The facts of this case and the facts of *Abraham* have many parallels. The uncontested facts show that the Hospital Defendants opposed specialty hospitals and pursued legislative means to inhibit their development. The uncontested facts further show that the Hospital Defendants vigorously discouraged the MCO Defendants from contracting with specialty hospitals. Viewed in a light most favorable to Heartland, the uncontested facts also establish that the MCO Defendants chose not to "panel" Heartland based on the opposition of the Hospital Defendants. In addition, like the optometrists in *Abraham,* Heartland paints itself as a favorable alternative to traditional hospitals.

Heartland shows more than the optometrists' showing in *Abraham,* however. Heartland offers evidence that the Hospital Defendants met publicly and discussed the competitive threat of specialty hospitals. The Hospital Defendants communicated their desired approach for dealing with specialty hospitals to the MCO Defendants. The Hospital Defendants' communications to the MCO Defendants could be viewed by the jury as veiled threats that the MCO Defendants either cooperate or risk losing the Hospital Defendants from their network.[34] The MCO Defendants

---

**34.** At oral argument, counsel acknowledged the significance of coercion or threats (or lack thereof) in discussions regarding whether

communicated with each other. The MCO Defendants reacted to Heartland in the manner proposed by the Hospital Defendants. Viewed in a light most favorable to Heartland, the facts also show that the MCO Defendants were able to negotiate lower reimbursement rates in exchange for their participation in the conspiracy by including network configuration clauses to exclude Heartland. And finally, the MCO Defendants and Hospital Defendants worked together to create exceptions to their network configuration language. These additional facts permit an inference of conspiracy.

The Hospital Defendants justify their desire for network configuration clauses because it is in a hospital's independent business interest to adopt clauses that restrict the number of its competitors that may contract with an MCO. This, however, does not explain why the Hospital Defendants were willing to work with their competitors to allow those competitors' majority-owned facilities into the MCO networks, while keeping physician-owned facilities out of network. If it is in a hospital's best interest to keep new facilities out of a network, then it would appear to be in that hospital's best interest to keep out both majority-owned and physician-owned facilities. The Hospital Defendants make no argument to justify this discrepancy.

To complete the circle, the MCO Defendants then justify their exclusion of Heartland from their networks based on the network configuration clauses, network need, and the penalties they would incur if they failed to comply with the network configuration clauses. While these justifications may present valid business reasons

for the MCO Defendants' conduct, the court has found that Heartland has produced direct evidence of an agreement amongst the MCO Defendants, along with a plausible economic motive. In addition, Heartland's circumstantial evidence supporting an agreement in which the MCO Defendants participated is not ambiguous—viewed in a light most favorable to Heartland, the evidence shows that both Aetna and Coventry responded to pressure from the Hospital Defendants by including network configuration language in their provider agreements in exchange for paying lower reimbursement rates to the Hospital Defendants. Therefore, there exists no reason to limit the inferences drawn from Heartland's evidence.

In conclusion, the facts, when taken in a light most favorable to Heartland, support a reasonable inference that the MCO Defendants had to have realized that if one MCO permitted Heartland to be an in-network provider, then that MCO would have a more expansive network than the other MCOs, which would be more attractive to employers and insureds. Because MCOs are in the business of providing attractive networks to employers and insureds, allowing one MCO to include Heartland without all MCOs being able to add Heartland would mean that the MCO with Heartland would have a competitive advantage over the others.

The uncontested facts are also clear that the Hospital Defendants would have been unhappy with Heartland obtaining in-network status; this fact is uncontested. The MCO Defendants had to make the Hospital Defendants happy in order to keep the

---

*Reazin* and *Abraham* can be reconciled. For example, Heartland argued that HCA Midwest's admission of its threatened rate increase to Aetna, despite HCA Midwest's acknowledgment that it had no basis for the proposed penalty, was an example of threats from the Hospital Defendants to the MCO

Defendants of rate increases if the MCO Defendants would not agree to the network configuration language. As might be expected, there is great disagreement about *whether* evidence of threats or coercion exists, which, of course, militates against summary judgment.

Hospital Defendants in their networks or in order to attract the Hospital Defendants to participate in their networks. Therefore, the reasonable inference, and the only way to keep the Hospital Defendants happy while ensuring that one MCO Defendant's network was not more attractive than the others, was to agree to exclude Heartland.

The weak direct evidence presented—that managed care organizations had an "unwritten understanding" to keep Heartland out of their networks—in addition to the plausible economic theory and circumstantial evidence outlined above, support this finding. "[C]onstruing all facts and reasonable inferences in a light most favorable to the nonmoving party," *Champagne Metals*, 458 F.3d at 1078 (internal quotation omitted), and considering the testimony and exhibits before it cumulatively, *Id.* at 1081 n. 6, the court finds sufficient evidence from which a reasonable jury could infer the defendants acted in concert to boycott Heartland by preventing Heartland from obtaining in-network managed care contracts.

### 4. Individual Defendants' Participation

Although the court has found that Heartland has presented sufficient evidence of a conspiracy, not all of the defendants' participation has been established. The court now analyzes each defendants' participation.

#### a. Aetna's Participation

Heartland alleges that the following evidence, both direct and circumstantial, shows Aetna's participation in the agreement outlined above:

- Aetna competes aggressively with MCO Defendants for members and employer accounts.
- Aetna attended the September 2003 Classic Cup Dinner wherein Saint

Luke's suggested that health plans should not contract with freestanding specialty hospitals and some of the MCOs in attendance acknowledged that they had not offered contracts to new specialty hospitals. Aetna also attended the September 2004 and 2005 Classic Cup Dinners. At the Classic Cup Dinners, Saint Luke's expressed its preference that the MCOs not contract with freestanding facilities and Saint Luke's applauded those MCOs that were following this practice.

- Aetna desired not to have network configuration clauses in its provider agreements but knew HCA Midwest did not want Aetna to contract with Heartland.

- In September 2004, Aetna negotiated the 2004 Aetna–HCA Midwest provider agreement amendment, with network configuration language excluding Heartland. These negotiations took place after Heartland requested to participate in Aetna's network in July, August, September, and November 2003, and before Heartland requested in-network status in October 2004. The negotiations took place after Aetna attended Classic Cup Dinners.

- Aetna proposed language in the draft of the 2004 Aetna–HCA Midwest amendment that if HCA Midwest did not have the same or substantially similar network configuration clause in all its major payor agreements (*i.e.*, those with Aetna, Blue Cross, Cigna, Coventry, and Humana), or did not enforce such a provision, then Aetna could request and HCA Midwest shall either bring the payor into compliance or release Aetna from its network configuration obligation.

- Aetna was contacted by HCA Midwest and Saint Luke's regarding the hospi-

tals' concerns over the use by Heartland of Aetna's name on its website.

- United's former director of network management, Laura Kozisek, testified that there was a "gentlemen's agreement," which was United's practice, that other managed care organizations in the Kansas City area were including facilities majority-owned by hospitals in their contracts. Kozisek also testified, however, that she did not know whether other managed care organizations had a "gentlemen's agreement" to allow majority-owned facilities to be included in the contracts being negotiated. Kozisek went on to testify that when she was a Carondelet employee, Carondelet would be able to contract a majority-owned ambulatory surgery center with Coventry because of this "understanding" but that the "understanding" had no relationship to excluding any other [ambulatory surgery center] from getting a contract with a particular payor.

- Kozisek additionally testified that "kind of the understanding, unwritten but understood" amongst managed care organizations was that managed care organizations would not be extending managed care contracts to specialty hospitals.

- In response to a request from Carondelet, Coventry contacted HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to ask each hospital if they would change or eliminate network configuration clauses that would prohibit the addition of Carondelet's majority-owned freestanding facility to Coventry's network. Shawnee Mission Medical Center agreed, as long as Saint Luke's and Carondelet agreed in return to the addition of one of Shawnee Mission Medical Center's freestanding facilities. HCA Midwest

and Saint Luke's indicated they were unwilling to modify their network configuration language. However, Saint Luke's testified that Coventry and Aetna have indicated their willingness to add Saint Luke's majority-owned freestanding facility. Also, HCA Midwest has agreed to allow hospital owned facilities to Blue Cross's networks without pursuing rate renegotiations.

- Aetna has granted in-network status for every hospital majority-owned facility since 2003.

Aetna's motion for summary judgment assumes Heartland's § 1 claim is based solely upon circumstantial evidence. (Doc. 778 at 16.) Aetna then argues that it is entitled to summary judgment because Heartland "cannot establish that Aetna's decision not to contract with [Heartland] was unambiguously inconsistent with Aetna's permissible independent business interests." (Doc. 778 at 17.)

Aetna attempts to exclude itself from any "gentlemen's agreement" with the following argument:

With respect to any 'understanding unwritten but understood' regarding MCOs and physician-owned specialty hospitals, Kozisek again was not testifying about Aetna. She was testifying regarding attendees at a HFMA meeting-which did not include Aetna. Although [Heartland] posed questions specifically about the meeting and then about her industry knowledge generally, the questions were regarding the attendees at that meeting (not Aetna). [Heartland] did not clarify who Kozisek meant when she said "MCOs" or lay the foundation to support any contention that she was competent to speak about Aetna's practices. She testified that this 'understanding' has no relationship to excluding any other ASC from getting

a contract from [a] particular payor. Moreover, she further testified that her industry knowledge was not really any different than hearing a rumor (*i.e.*, not based on personal knowledge). Aetna disputes that there was an understanding 'unwritten but understood' between Aetna and any other person that MCOs would not extend managed care contracts to physician-owned specialty hospitals or [Heartland]. Kozisek's statements, for which she admits she has no personal knowledge, are not admissible as to Aetna because they lack foundation, are not relevant, and are hearsay.

(Doc. 901 at 4 (internal record citations omitted).) Aetna's counsel did not pursue these topics with Kozisek at Kozisek's deposition. Aetna's assertion that Kozisek was testifying regarding attendees at the HFMA Meeting is simply incorrect, which, in turn, makes incorrect Aetna's assertion that Kozisek "was not testifying about Aetna." The deposition questions and answers state:

> Q. I understand that, but did you learn at [the HFMA] meeting that other managed care organizations would not be extending managed care contracts to specialty hospitals, as you've defined them?
>
> A. No, I did not learn that at that meeting.

Q. Did you have an understanding that that was the case generally through your work in the industry?

A. That was kind of the understanding, unwritten but understood.

(Doc. 902 Exh. 15 at 81.) The testimony clearly states that Kozisek's did *not* learn of the unwritten understanding amongst MCOs to not extend managed care contracts to specialty hospitals at the HFMA Meeting. Rather, the testimony shows that Kozisek learned of this unwritten understanding generally through her work in the industry. Aetna is a managed care organization operating in the Kansas City area.

The foundation for Kozisek's testimony was her knowledge through her work in the industry. Defense attorneys, later in the deposition, asked Kozisek: "In your mind is industry knowledge and rumor any different?" and Kozisek answered "Not really." Counsel did not tie this question to Kozisek's earlier deposition testimony and it does not controvert Kozisek's earlier statement. Counsel did not register a foundation objection so that Kozisek's testimony could be supplemented. The testimony is obviously relevant to the central matter in these motions, whether there was an agreement constituting a § 1 conspiracy. Kozisek's statement goes directly to the heart of this issue. Finally, Aetna has offered no support for its hearsay argument, factually or legally.[35]

---

**35.** At oral argument, Aetna's counsel asserted that Kozisek's testimony is not admissible under Fed.R.Evid. 602 and 701, citing *ORI, Inc. v. Lanewala*, 147 F.Supp.2d 1069, 1080 (D.Kan.2001). In *ORI, Inc.*, Chief Judge Lungstrum refused to consider on summary judgment affidavits of company officers who "do not contend to have witnessed, overheard or otherwise experienced" the actions of a former officer; in other words, that the affiants lacked personal knowledge of the subject matter in their affidavits.

Here, the court is satisfied that Kozisek was in a position to have at least some knowledge of the "unwritten understanding" and "gentlemen's agreement." Beyond that, it is pertinent that her statements were made at a deposition, where she could be questioned regarding the basis of her knowledge of the "understanding" and "agreement," including the persons and/or entities involved or, perhaps more pertinent, *not* involved. While the court assigns no criticism to the lawyers who did not explore these matters, it is not in a position to find Kozisek's testimony inadmissible, especially at summary judgment.

Aetna's arguments against Kozisek's testimony fail to persuade this court from its finding that Kozisek's testimony is weak direct evidence of an agreement.[36] Aetna's arguments regarding Heartland's circumstantial evidence are also unpersuasive. As the court has discussed above, Heartland has shown more than the plaintiffs in the *Abraham, Mitchael,* and *Reazin* cases which affirmed grants of summary judgment based on an agreement not being shown.

Like the defendants in *Abraham,* Aetna knew HCA Midwest and Saint Luke's were opposed to specialty hospitals. Aetna chose not to contract with specialty hospitals based on HCA Midwest's complaints despite Heartland being a favorable facility. Heartland has shown more than the *Abraham* case, however. Aetna attended the Classic Cup Dinners wherein actions in opposition to specialty hospitals were discussed, after which Aetna contracted a network configuration clause with HCA Midwest. In addition, Aetna cannot be excluded from the unwritten understanding amongst MCOs to exclude physician owned specialty hospitals, despite agreeing to allow in-network status to hospital majority-owned specialty facilities.

Like the defendants in *Mitchael,* Heartland has shown consistency in behavior between Aetna and the other MCO Defendants and their use of network configuration clauses in their contracts with the Hospital Defendants. Heartland has shown more that the *Mitchael* case, however. Aetna desired to negotiate reduced payments with HCA Midwest while main-

taining a network that could compete with the other MCO Defendants.

Finally, like the defendants in *Reazin,* Aetna participated in an existing forum— the Classic Cup Dinners—wherein discussions relating to the exclusion of specialty hospitals took place, that a relationship existed between the exclusion of Heartland from Aetna's networks and reduced rates paid to HCA Midwest, and communications from HCA Midwest to Aetna exist evidencing the relationship; in addition, Heartland has also shown that Aetna participated in the cooperated effort to allow hospital majority-owned specialty facilities into MCO networks while continuing to exclude physician-owned specialty facilities.

Inferences from the above facts are further supportive of Aetna's participation in the conspiracy. For example, the evidence that Aetna sought assurances from HCA Midwest that HCA Midwest would seek to enforce network configuration language from all its MCO contracts permits an inference that Aetna knew HCA Midwest was seeking the same network configuration from others, which is evidence of Heartland's alleged economic motive that the conspiracy needed all MCOs and hospitals to join in order to be effective.

In addition, when Aetna contracted with HCA Midwest in September 2004 to modify its network configuration language with HCA Midwest, Aetna had recently attended the 2003 and 2004 Classic Cup Dinners. At the Classic Cup Dinners, it was made clear to Aetna and the other MCOs in attendance that the traditional hospitals

---

**36.** The court assumes that the portions of Kozisek's testimony which it has been provided are the relevant portions. In the clear light of 20–20 hindsight, Kozisek could have been asked additional questions or she could have been permitted to explain her answers in more detail, but whether that would have

made a difference is speculation. Should Kozisek be called as a witness at trial, what she may say is also speculation. The point is that at summary judgment, her testimony must be viewed in the light most favorable to Heartland.

wanted MCOs to agree to exclude physician-owned specialty hospitals, which permits an inference that Aetna's agreement with HCA Midwest excluding physician-owned specialty hospitals was in response to an agreement (even if tacit) at the Classic Cup Dinners. *See Twombly,* 127 S.Ct. at 1964 (stating that the agreement supporting a finding of a conspiracy may be "tacit or express"). Black's Law Dictionary defines tacit, in part, as: "Existing, inferred, or understood without being openly expressed or stated; ... Manifested by the refraining from contradiction or objection; inferred from the situation and circumstances, in the absence of express matter." *Black's Law Dictionary* 1302 (5th ed.1979). Heartland has presented sufficient evidence from which a jury could find that Aetna participated in a tacit agreement to boycott Heartland.

Aetna has not even addressed Heartland's theory of economic motive nor any reason to limit the inferences that can be drawn from Heartland's circumstantial evidence.[37] Because of Heartland's weak direct evidence, Heartland's plausible economic motive, and inferences that can be drawn from Heartland's circumstantial evidence, Aetna's motion for summary judgment on Heartland's antitrust claim must be DENIED.

### b. Coventry's Participation

Heartland alleges that the following evidence, both direct and circumstantial, shows Coventry's participation in the agreement outlined above:

- Coventry considers HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to be significant partners to its networks.
- Coventry aggressively competes with the MCO Defendants for members and employer accounts in the Kansas City metropolitan area.
- Coventry gave good initial responses to Heartland regarding Heartland's contracting status and recognized that Heartland was a state of the art facility.
- Coventry wanted to eliminate all network configuration language from its provider agreements.
- Coventry attended the September 2003 Classic Cup Dinner at which Saint Luke's suggested that health plans should not contract with free-standing specialty hospitals and some of the MCOs in attendance acknowledged that they had not offered contracts to new specialty hospitals. Coventry also attended the September 2004 and 2005 Classic Cup Dinners. At the Classic Cup Dinners, Saint Luke's expressed its preference that the MCOs not contract with freestanding facilities and Saint Luke's applauded those MCOs that were following this practice. Coventry's attendee's notes from the 2005 Classic Cup Dinners state that health plans and hospitals should agree to add joint ventures but not specialty hospitals.
- Coventry attended the April 2004 Ingram's Magazine Meeting wherein MCOs that planned to keep Heartland out of their networks were applauded and Coventry, along with other MCOs,

---

**37.** Aetna does little more than fall back on its main argument to this court: that the estimated one and a half million dollar rate concession it would have forfeited to HCA Midwest if it had added Heartland to its network in July 2003 was a sufficient independent business reason for its exclusion of Heartland.

This argument ignores the direct evidence of an agreement—Kozisek's testimony—and the standards of law that apply when direct evidence is shown and fails to take into account Aetna's rejection of Heartland after the Aetna–HCA Midwest provider agreement was renegotiated.

communicated its commitment to not contract with specialty hospitals.

- Coventry attended the January 2005 HFMA Meeting wherein several hospitals expressed their views against specialty hospitals. Coventry's attendee's notes of the meeting state, under the heading "Specialty Hospitals": "when aligned w/hospitals—'winner all around' provides competition provides innovation HCA/Carondelet pursuing this . . . work cooperatively."

- Coventry negotiated provider agreements with HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center that exclude Heartland from its networks after attending these meetings, and after Heartland asked to participate in Coventry's networks.

- Coventry stated that it would not give Heartland an in-network contract because it did not want to cross Saint Luke's and Shawnee Mission Medical Center.

- Coventry confronted HCA Midwest and Saint Luke's about Heartland's PAR agreement with Blue Cross.

- In response to an inquiry from an employer, Coventry informed the employer, HCA Midwest, and Cigna that it was not contracting with Heartland and it hoped no hospital would purchase the facility.

- United's former director of network management, Laura Kozisek, testified that there was a "gentlemen's agreement," which was United's practice, that other managed care organizations in the Kansas City area were including facilities majority-owned by hospitals in their contracts. Kozisek also testified, however, that she did not know whether other managed care organizations had a gentlemen's agreement to allow majority-owned facilities to be included in the contracts being negotiated. Kozisek went on to testify that when she was a Carondelet employee, Carondelet would be able to contract a majority-owned ambulatory surgery center with Coventry because of this "understanding." Kozisek testified that the "understanding" "had no relationship to excluding any other [ambulatory surgery center] from getting a contract with a particular payor."

- Kozisek additionally testified that "kind of the understanding, unwritten but understood" amongst managed care organizations was that managed care organizations would not be extending managed care contracts to specialty hospitals.

- In response to a request from Carondelet, Coventry contacted HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to ask each hospital if they would change or eliminate network configuration clauses that would prohibit the addition of Carondelet's majority-owned freestanding facility to Coventry's network. Shawnee Mission Medical Center agreed, as long as Saint Luke's and Carondelet agreed in return to the addition of one of Shawnee Mission Medical Center's freestanding facilities. HCA Midwest and Saint Luke's indicated they were unwilling to modify their network configuration language. However, Saint Luke's testified that Coventry and Aetna indicated their willingness to add Saint Luke's majority-owned freestanding facility. Also, HCA Midwest agreed to allow hospital owned facilities to Blue Cross's networks without pursuing rate renegotiations. Finally, Shawnee Mission Medical Center recognized in an e-mail to Coventry that it is waiving its network configuration language for Carondelet's benefit and would need HCA Midwest to do the same for it.

- A Coventry employee testified that, regarding changes or modifications to Shawnee Mission Medical Center's network configuration language to permit joint venture majority ownership by participating hospitals, Coventry's chief executive officer had meetings and discussions with HCA Midwest, Shawnee Mission Medical Center, and Saint Luke's because it "required all to be cooperative with each other."
- Coventry heard that HCA Midwest did not participate in any networks that Heartland also participated in. When Coventry informed HCA Midwest that Heartland would be participating in one of its networks, HCA Midwest told Coventry it would terminate its agreement with HCA Midwest if Coventry continued to have Heartland as a provider.
- Coventry has since committed to HCA Midwest, Saint Luke's, Shawnee Mission Medical Center, and Carondelet that it will add new facilities to its networks that are majority-owned by these Hospital Defendants.
- Heartland is the only freestanding facility majority owned by physicians that has requested and been denied access to Coventry's networks.
- Coventry did not perform a network needs analysis prior to refusing to contract with Heartland and relied only on its network configuration clauses.

Heartland's propounded evidence of Coventry's participation in the conspiracy to boycott is stronger than that against Aetna. In *addition to* the analysis immediately above, the court finds the following to be circumstantial evidence of Coventry's participation in the conspiracy. First, Coventry recognized the importance of the three largest Hospital Defendants to its networks and that the MCO Defendants are its direct competitors. Coventry initially recognized the benefits of Heartland to its network and wanted to eliminate network configuration clauses. Then, Coventry attended the Classic Cup Dinners, the Ingram's Magazine Meeting, and the HFMA Meeting at which extensive discussion concerning strategies for protecting traditional hospitals from physician-owned hospitals were discussed. After attending these meetings, and after Heartland asked to participate in Coventry's networks, Coventry negotiated provider agreements with HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center that exclude Heartland from its networks.

Coventry also is one of the MCOs in the Kansas City area and thus it can be inferred that it is also subject to the "unwritten understanding" amongst the MCOs that MCOs would not contract with physician-owned specialty hospitals. Finally, Coventry coordinated the effort to permit the inclusion of hospital majority-owned specialty facilities into MCO networks while maintaining an exclusion of physician-owned specialty facilities from those MCO networks.

Like Aetna, Coventry has not addressed Heartland's theory of economic motive nor any reason to limit the inferences that can be drawn from Heartland's circumstantial evidence. Because of Heartland's weak direct evidence, Heartland's plausible economic motive, and inferences that can be drawn from Heartland's circumstantial evidence, Coventry's motion for summary judgment on Heartland's antitrust claim must be DENIED.

### c. HCA Midwest's Participation

Heartland alleges that the following evidence shows HCA Midwest's participation in the agreement outlined above:
- HCA Midwest viewed Heartland as a competitive threat based on its fear of loss of patient volume and recognized that the cooperation of all MCOs

would be necessary to counter this threat.

- HCA Midwest communicated to Aetna, Blue Cross, Cigna, and Humana that it did not want the MCOs contracting with physician-owned facilities.
- HCA Midwest and Shawnee Mission Medical Center met and discussed specialty hospitals and worked on ways to deal with the specialty hospital threat.
- HCA Midwest negotiated agreements with at least Aetna, Coventry, Blue Cross, Cigna, and Humana, and attempted contracts with United, that contain network configuration language excluding Heartland.
- HCA Midwest communicated to Cigna that it was treating all MCOs the same with respect to provider agreements.
- HCA Midwest recognized that it had no basis for its threatened penalty percentages for MCOs adding specialty hospitals to their networks and did not perform loss of volume analyses justifying any rate penalties.
- HCA Midwest asked Blue Cross to monitor Heartland's physicians referral practices to make sure business was not "leaking" to Heartland.
- HCA Midwest contacted Aetna regarding Heartland's use of Aetna's name on its website.
- HCA Midwest hosted the April 2004 Ingram's Magazine Meeting wherein an attendee hospital expressed its view that specialty hospitals were competitive threats, MCOs who planned to keep Heartland out of their networks were applauded, and MCOs communicated their commitment not to contract with specialty providers.
- HCA Midwest attended the January 2005 HFMA Meeting wherein several hospitals expressed their views against specialty hospitals. An MCO's attendee's notes of the meeting state, under

the heading "Specialty Hospitals": "when aligned w/hospitals—'winner all around' provides competition provides innovation HCA/Carondelet pursuing this . . . work cooperatively."

- In response to a request from Carondelet, Coventry contacted HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to ask each hospital if they would change or eliminate network configuration clauses that would prohibit the addition of Carondelet's majority-owned freestanding facility to Coventry's network. Shawnee Mission Medical Center agreed, as long as Saint Luke's and Carondelet agreed in return to the addition of one of Shawnee Mission Medical Center's freestanding facilities. HCA Midwest and Saint Luke's indicated they were unwilling to modify their network configuration language. However, Saint Luke's testified that Coventry and Aetna indicated their willingness to add Saint Luke's majority-owned freestanding facility. Also, HCA Midwest agreed to allow hospital owned facilities to Blue Cross's networks without pursuing rate renegotiations. Finally, Shawnee Mission Medical Center recognized in an e-mail to Coventry that it is waiving its network configuration language for Carondelet's benefit and would need HCA Midwest to do the same for it.
- A Coventry employee testified that, regarding changes or modifications to Shawnee Mission Medical Center's network configuration language to permit joint venture majority ownership by participating hospitals, Coventry's chief executive officer had meetings and discussions with HCA Midwest, Shawnee Mission Medical Center, and Saint Luke's because it "required all to be cooperative with each other."

- Coventry heard that HCA Midwest did not participate in any networks that Heartland also participated in. When Coventry informed HCA Midwest that Heartland would be participating in one of its networks, HCA Midwest told Coventry it would terminate its agreement with HCA Midwest if Coventry continued to have Heartland as a provider.

HCA Midwest alleges there is no evidence of a horizontal agreement amongst the Hospital Defendants.[38] The court disagrees. The circumstantial evidence shows that HCA Midwest recognized Heartland as a competitive threat; HCA Midwest and Shawnee Mission Medical Center met and discussed specialty hospitals and worked on ways to deal with the specialty hospital threat; HCA Midwest attended the Ingram's Magazine Meeting and the HFMA Meeting at which Hospital Defendants expressed their preferred approach for dealing with physician-owned specialty hospitals; and HCA Midwest has agreed to allow hospital majority-owned facilities (*i.e.*, its competitors) into Blue Cross's networks without pursuing rate renegotiations, despite its contractual ability to do so. In addition, after HCA Midwest's attendance at the Ingram's Magazine and HFMA meetings with other Hospital Defendants, HCA Midwest acted to carry out the ideas propounded at those meetings, which additionally permits an inference of an agreement.

For these reasons, and in accordance with the standards of law discussed throughout this memorandum and order, HCA Midwest's joint motion for partial summary judgment is DENIED.

### d. Saint Luke's Participation

Heartland alleges that the following evidence shows Saint Luke's participation in the agreement outlined above:

- Saint Luke's recognized specialty hospitals like Heartland as a competitive threat and that the cooperation of all MCOs would be necessary to keep Heartland from contracting with Heartland.

- Saint Luke's communicated to Aetna, Coventry, United, Blue Cross, and Cigna, either that MCOs should not contract with physician-owned specialty hospitals or that it would not approve of Coventry adding Heartland to its network.

- Saint Luke's e-mailed an affiliate of North Kansas City Hospital to facilitate discussion regarding contract provisions with MCOs.

- Saint Luke's hosted the September 2003, 2004, and 2005 Classic Cup Dinners at which it suggested that MCOs should not contract with specialty hos-

---

**38.** The Hospital Defendants' motion for summary judgment makes the argument that Heartland must prove a horizontal agreement to threaten to refuse to deal with MCOs if the MCOs contracted with Heartland, rather than a horizontal agreement to structure contracts with MCOs that cause a boycott of Heartland. (Doc. 835 at 17.) Heartland disputes this characterization of its complaint. (Doc. 899 at 40.) Count One of Heartland's Third Amended Complaint alleges a horizontal agreement amongst Hospital Defendants to effectuate a boycott by MCOs of Heartland, and that this horizontal agreement is either a *per se* violation of § 1 or a violation of § 1 under the rule of reason. (Doc. 249 at 21–22.) Count Two of Heartland's Third Amended Complaint alleges that the Hospital Defendants, with the Managed Care Defendants, engaged in a boycott of Heartland. (Doc. 249 at 23–24.) Regardless of the parties' characterization of this dispute, the court finds that the Hospital Defendants have moved for a summary ruling that they (the Hospital Defendants) did not participate in a horizontal agreement in restraint of trade. The court cannot so find, for the reasons stated herein, despite the arguments of the Hospital Defendants' highly competent and experienced counsel.

pitals not majority owned by a hospital and applauded MCOs that followed this practice.

- Saint Luke's attended the April 2004 Ingram's Magazine Meeting at which an attendee hospital expressed its view that specialty hospitals were competitive threats, MCOs which planned to keep Heartland out of their networks were applauded, and MCOs communicated their commitment not to contract with specialty providers.

- Saint Luke's attended the January 2005 HFMA Meeting at which several hospitals expressed their views against specialty hospitals. An MCO's attendee's notes of the meeting state, under the heading "Specialty Hospitals": "when aligned w/hospitals—'winner all around' provides competition provides innovation HCA/Carondelet pursuing this … work cooperatively."

- Saint Luke's negotiated provider agreements with at least Coventry, United, and Cigna that contain network configuration language excluding Heartland.

- Saint Luke's performed no loss of volume analyses for Heartland being added to one of the networks it participates in.

- Saint Luke's communicated with Aetna, United, and Blue Cross asking whether the MCOs had contracted with Heartland after Heartland listed the MCOs names on its website. All three MCOs assured Saint Luke's that they did not have in-network contracts. Saint Luke's informed Aetna and United that neither Cigna nor Coventry were listed by Heartland on its website.

- In response to a request from Carondelet, Coventry contacted HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to ask each hospital if they would change or eliminate network configuration clauses that would prohibit the addition of Carondelet's majority-owned freestanding facility to Coventry's network. Shawnee Mission Medical Center agreed, as long as Saint Luke's and Carondelet agreed in return to the addition of one of Shawnee Mission Medical Center's freestanding facilities. HCA Midwest and Saint Luke's indicated they were unwilling to modify their network configuration language. However, Saint Luke's testified that Coventry and Aetna indicated their willingness to add Saint Luke's majority-owned freestanding facility. Also, HCA Midwest waived network configuration rights for Saint Luke's in Coventry's networks and has agreed to allow hospital owned facilities to Blue Cross's networks without pursuing rate renegotiations. Finally, Shawnee Mission Medical Center recognized in an e-mail to Coventry that it is waiving its network configuration language for Carondelet's benefit and would need HCA Midwest to do the same for it.

- A Coventry employee testified that, regarding changes or modifications to Shawnee Mission Medical Center's network configuration language to permit joint venture majority ownership by participating hospitals, Coventry's chief executive officer had meetings and discussions with HCA Midwest, Shawnee Mission Medical Center, and Saint Luke's because it "required all to be cooperative with each other."

The court finds sufficient circumstantial evidence of Saint Luke's participation in a horizontal agreement amongst the Hospital Defendants. The circumstantial evidence shows that Saint Luke's recognized Heartland as a competitive threat; Saint

Luke's e-mailed an affiliate of North Kansas City Hospital to facilitate discussion regarding contract provisions with MCOs; Saint Luke's attended the Ingram's Magazine Meeting and the HFMA Meeting at which Hospital Defendants expressed their preferred approach for dealing with physician-owned specialty hospitals; and Saint Luke's participated in coordinated discussions concerning competing Hospital Defendants' permission to add hospital majority-owned facilities while maintaining exclusions for physician-owned facilities. In addition, after Saint Luke's attendance at the Ingram's Magazine and HFMA meetings with other Hospital Defendants, Saint Luke's acted to carry out the ideas propounded at those meetings, which additionally permits an inference of an agreement.

For these reasons, and in accordance with the standards of law discussed throughout this memorandum and order, Saint Luke's joint motion for partial summary judgment is DENIED.

### e. Shawnee Mission Medical Center's Participation

Heartland alleges that the following evidence shows Shawnee Mission Medical Center's participation in the agreement outlined above:

- Shawnee Mission Medical Center recognized Heartland as a competitive threat and publicly stated that it was opposed to physician-owned specialty hospitals.
- Shawnee Mission Medical Center communicated to Blue Cross concerning Heartland's contract status.
- Shawnee Mission Medical Center and HCA Midwest met and discussed specialty hospitals and worked on ways to deal with the specialty hospital threat.
- Shawnee Mission Medical Center publicly stated its opposition to the proliferation of specialty hospitals or surgery centers that are not at least fifty-one percent owned by traditional hospitals, at open trade-like meetings.
- Shawnee Mission Medical Center attended the January 2005 HFMA Meeting wherein several hospitals expressed their views against specialty hospitals. An MCO's attendee's notes of the meeting state, under the heading "Specialty Hospitals": "when aligned w/hospitals—'winner all around' provides competition provides innovation HCA/Carondelet pursuing this . . . work cooperatively."
- Shawnee Mission Medical Center negotiated provider agreements with at least Coventry that contain network configuration language excluding Heartland.
- Shawnee Mission Medical Center stated that it was going to find a way to either put Heartland out of business or hurt Heartland's contracting so bad that Heartland would be crippled and unsuccessful.
- Shawnee Mission Medical Center stated that it would do whatever was necessary to ensure that Heartland would not succeed as a physician-owned facility.
- In response to a request from Carondelet, Coventry contacted HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to ask each hospital if they would change or eliminate network configuration clauses that would prohibit the addition of Carondelet's majority-owned freestanding facility to Coventry's network. Shawnee Mission Medical Center agreed, as long as Saint Luke's and Carondelet agreed in return to the addition of one of Shawnee Mission Medical Center's freestanding facilities. HCA Midwest and Saint Luke's indicated they were

unwilling to modify their network configuration language. However, Saint Luke's testified that Coventry and Aetna indicated their willingness to add Saint Luke's majority-owned freestanding facility. Also, HCA Midwest agreed to allow hospital owned facilities to Blue Cross's networks without pursuing rate renegotiations. Finally, Shawnee Mission Medical Center recognized in an e-mail to Coventry that it is waiving its network configuration language for Carondelet's benefit and would need HCA Midwest to do the same for it.

- A Coventry employee testified that, regarding changes or modifications to Shawnee Mission Medical Center's network configuration language to permit joint venture majority ownership by participating hospitals, Coventry's chief executive officer had meetings and discussions with HCA Midwest, Shawnee Mission Medical Center, and Saint Luke's because it "required all to be cooperative with each other."

The court finds sufficient circumstantial evidence of Shawnee Mission Medical Center's participation in a horizontal agreement amongst the Hospital Defendants. The circumstantial evidence shows that Shawnee Mission Medical Center recognized Heartland as a competitive threat; Shawnee Mission Medical Center and HCA Midwest met and discussed specialty hospitals and worked on ways to deal with the specialty hospital threat; Shawnee Mission Medical Center attended the HFMA Meeting at which Hospital Defendants expressed their preferred approach for dealing with physician-owned specialty hospitals; Shawnee Mission Medical Center stated that it would do whatever it could do to keep Heartland from succeeding; and Shawnee Mission Medical Center approved an addition to Coventry's network, as long as Saint Luke's and Carondelet agreed in return to the addition of one of Shawnee Mission Medical Center's freestanding facilities. In addition, after Shawnee Mission Medical Center's attendance at the HFMA Meeting with other Hospital Defendants, Shawnee Mission Medical Center acted to carry out the ideas propounded at the meeting, which additionally permits an inference of an agreement.

For these reasons, and in accordance with the standards of law discussed throughout this memorandum and order, Shawnee Mission Medical Center's joint motion for partial summary judgment is DENIED.

### f. Carondelet's Participation

 Heartland alleges that the following evidence shows Carondelet's participation in the agreement outlined above:

- Carondelet recognized Heartland's impact on the market.

- Carondelet attended the January 2005 HFMA Meeting wherein several hospitals expressed their views against specialty hospitals. An MCO's attendee's notes of the meeting state, under the heading "Specialty Hospitals": "when aligned w/hospitals—'winner all around' provides competition provides innovation HCA/Carondelet pursuing this ... work cooperatively."

- Carondelet attempted to negotiate provider agreements with at least Aetna, Coventry, and Cigna that contain network configuration language excluding Heartland.

- In response to a request from Carondelet, Coventry contacted HCA Midwest, Saint Luke's, and Shawnee Mission Medical Center to ask each hospital if they would change or eliminate network configuration clauses that would prohibit the addition of Carondelet's majority-owned free-

standing facility to Coventry's network. Shawnee Mission Medical Center agreed, as long as Saint Luke's and Carondelet agreed in return to the addition of one of Shawnee Mission Medical Center's freestanding facilities. HCA Midwest and Saint Luke's indicated they were unwilling to modify their network configuration language. However, Saint Luke's testified that Coventry and Aetna indicated their willingness to add Saint Luke's majority-owned freestanding facility. Also, HCA Midwest agreed to allow hospital owned facilities to Blue Cross's networks without pursuing rate renegotiations. Finally, Shawnee Mission Medical Center recognized in an e-mail to Coventry that it is waiving its network configuration language for Carondelet's benefit and would need HCA Midwest to do the same for it.

Finally, the court analyzes Carondelet's participation in the horizontal agreement amongst Hospital Defendants. Heartland shows only that Carondelet recognized Heartland's impact on the market; Carondelet attended the HFMA Meeting at which Hospital Defendants expressed their preferred approach for dealing with physician-owned specialty hospitals; Carondelet "attempted" to negotiate agreements with MCO Defendants with network configuration language; and Carondelet asked Coventry if its hospital majority-owned facility could be added to Coventry's networks. This is not enough. Heartland does not establish when Carondelet attempted to negotiate this network configuration language, does not establish the continued participation by Carondelet in Coventry's attempts to coordinate Hospital Defendants to allow the inclusion of hospital majority-owned specialty hospitals, and does not establish if Carondelet participated in any actions in furtherance of the conspiracy after Carondelet's attendance at the HFMA Meeting.

Carondelet's motion for summary judgment concerning its participation in a horizontal conspiracy with the Hospital Defendants is GRANTED. Carondelet has not moved for summary judgment on any other portion of Heartland's antitrust claim, or on Heartland's tort claims, and therefore remains in this litigation.

### 5. Conclusion—Sherman Act

"While consciously parallel behavior may contribute to a finding of antitrust conspiracy, it is insufficient, standing alone, to prove conspiracy. Such parallel behavior may, however, support the existence of an illegal agreement when augmented by additional evidence from which an understanding among the parties may be inferred. Such evidence may include a showing that the parties are acting against their own individual business interests, or that there is motivation to enter into an agreement requiring parallel behavior." *Mitchael*, 179 F.3d at 859 (internal citations and quotations omitted). Heartland has obviously shown parallel behavior amongst the defendants. However, in addition, it has shown motivation to enter an agreement to boycott and that the competing defendants cooperated with each other to effectuate the agreement.

The court realizes that concerted action cannot "be inferred merely from the existence of complaints." *Abraham*, 461 F.3d at 1259. However, because the alleged conspiracy is economically rational, "restrictions on the inferences drawn from Heartland's circumstantial evidence are not warranted." *Champagne Metals*, 458 F.3d at 1085; *cf. Abraham*, 461 F.3d at 1257 (" '[I]f the claim is one that simply makes no economic sense—[a plaintiff] must come forward with more persuasive evidence to support [its] claim than would

otherwise be necessary.'" (quoting *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348)). Heartland has shown direct evidence on an agreement amongst the MCO Defendants and, regarding all defendants, has come forward with "evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348 (quoting *Monsanto*, 465 U.S. at 764, 104 S.Ct. 1464).

In reaching its decision on the motions for summary judgment, the court has adhered to its role of determining whether sufficient evidence exists on which a trier of fact could reasonably find for Heartland. Heartland should not presume that the court believes it has a strong case against any or all of the defendants. On the contrary, as the court observed in *Rossi*, "the evidence is far from conclusive." 156 F.3d at 472. The parties must keep uppermost in mind that this case will be tried to a jury, which will not finely parse the evidence as the court has done in this memorandum. A lot will ride on the credibility of witnesses and other factors which this court has not, and will not, consider in ruling on motions for summary judgment.

The court realizes that additional dispositive motions will be filed and urges the parties to concentrate in their submissions on facts which are truly material and upon which there is, or is not, a genuine factual dispute. In other words, for example, it may be that there is a dispute regarding the number of beds in Heartland's hospital, but how was that dispute relevant to the issues in the motions the court has just decided? It was not and that is only one of several examples of facts cluttering the records which had nothing to do with the issues.

The court knows that this case is important to the parties, which have spent an enormous amount of effort, time and money to bring the case this far. At the same time, the parties must recognize that this is not the court's only case and that there is a limit to the amount of time and attention the court can devote to it. The parties need to keep this in mind when preparing future motions.

### B. Tortious Interference with a Prospective Business Relationship

 To prove a claim for tortious interference with a prospective business relationship under Kansas law,[39] a plaintiff must prove:

(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff;

(2) knowledge of the relationship or expectancy by the defendant;

(3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy;

(4) intentional misconduct by defendant; and

(5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106, 1115 (Kan.1986); *see also* Kansas Civil PIK 124.92 (listing elements of proof).

Aetna and Coventry argue that Heartland cannot prove that they engaged in wrongful conduct to communicate with any specific third party with whom Heartland had the expectancy of a business relationship. (Docs. 778 at 28; 852 at 26.) Aetna

---

**39.** The parties do not dispute that Kansas law applies to Heartland's common law tort claims.

and Coventry cite several federal district court cases for the propositions that: 1) Aetna and Coventry must have interfered with the relationship between Heartland and a specific third party; and 2) a communication between Aetna/Coventry and the third party is required. (Docs. 778 at 28; 852 at 26 (citing *Arnold v. Air Midwest, Inc.*, 877 F.Supp. 1452 (D.Kan.1995); *DP–Tek, Inc. v. AT & T Global Information Solutions Co.*, 891 F.Supp. 1510 (D.Kan.1995); *L & M Enterprises, Inc. v. BEI Sensors & Systems, Co.*, 45 F.Supp.2d 879 (D.Kan.1999)).) Specifically, Aetna and Coventry argue that Heartland's claim of tortious interference with a prospective business relationship fails as to elements one (existence of a business relationship) and four (intentional misconduct) and that Heartland has not identified a third party to whom Aetna/Coventry has communicated. (Docs. 778 at 28–29; 852 at 26–28.)

 Regarding element one of its tortious interference claim, Heartland's Third Amended Complaint identifies the alleged business expectancy as its relationships with insureds under managed care contracts. (Doc. 249 at ¶ 83.) Heartland cites *Reazin* in support of its contention that a hospital plaintiff can have a business expectancy with insureds of an MCO defendant for a tortious interference claim. (Doc. 833 at 38.)

In *Reazin*, a case heavily cited herein, the Tenth Circuit discussed the plaintiffs' state law claim of tortious interference after affirming the lower court's denial of the defendants' motions for judgment n.o.v. or for a new trial on the plaintiffs' antitrust claims. 899 F.2d at 976. The plaintiff hospital characterized its claim as tortious interference with present and future relations with the defendant MCO's subscribers. *Id.* The Tenth Circuit affirmed the lower court's denial of the defendant MCO's motions for judgment n.o.v.

or for a new trial based on its approval of the lower court's jury instructions. *Id.*

Those instructions informed the jury that the first element of the plaintiff hospital's tortious interference claim could be proved by a finding that "there existed a present business relationship and/or the expectancy of a future relationship with economic benefits between [the plaintiff hospital] and [the defendant MCO's] subscribers." *Id.* The court did not comment on this element of the instruction, and instead focused its analysis on whether the instructions properly instructed that the jury must also find improper conduct to support a finding of tortious interference. *Id.* at 977. Aetna cites *Reazin*, but states only that the "parties did not dispute that a hospital with a provider agreement with [a] MCO had both an existing and prospective business relationship with insureds." (Doc. 778 at 30 n. 9.) Coventry does not discuss the *Reazin* case.

Aetna and Coventry instead cite a string of cases that they contend support their position that Heartland "does not have a prospective business relationship or expectancy with [MCO Defendants'] insureds because [MCO Defendants], not the insureds, [are] considered the buyer of [Heartland's] services": *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301 (5th Cir.1997), *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*, 996 F.2d 537 (2d Cir.1993), *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir.1984), *Klamath–Lake Pharmaceutical Association v. Klamath Medical Service Bureau*, 701 F.2d 1276 (9th Cir.1983), *Drug Emporium, Inc. v. Blue Cross of Western New York, Inc.*, 104 F.Supp.2d 184 (W.D.N.Y.2000), *Bohatiuk v. Delaware Chiropractic Services Network, L.L.C.*, C.A. No. 95C–10–277 SCD, 1997 WL 34615032 (Del.Super.Ct. Apr. 11,

1997). (Doc. 778 at 29, *see also* Doc. 852 at 26–27.)

Many of the cases cited are not tortious interference cases, but, rather, deal with particular elements of a Sherman Act claim. *See, e.g., Doctor's Hospital of Jefferson, Inc.*, 123 F.3d at 308 (stating, without discussion or citation of authority, in a discussion of whether the plaintiff had shown the requisite harm to competition to survive summary judgment of its Sherman Act § 1 claim, that the "purchasers of managed care services are the employers, insurance companies and other entities who control which plan a group of individuals will join"); *Capital Imaging Associates, P.C.*, 996 F.2d at 539 (stating that the defendant health plan "purchases medical services" from the co-defendant physicians group in its discussion of the relationship amongst the parties to the Sherman Act litigation); *Kartell*, 749 F.2d at 925–28 (finding, in its analysis of whether the defendant MCO's behavior was a restraint on trade, that the MCO defendant was the purchaser of services from the plaintiff physicians); *Klamath–Lake Pharmaceutical Association*, 701 F.2d at 1291 (finding no Sherman Act conspiracy between the defendant health insurer and the co-defendant pharmacy, whether the pharmacy was viewed as a distributor of the health insurer's products or as a supplier of products under contract to the health insurer).

Only two cases cited by Aetna and Coventry discuss this issue in the context of a tortious interference claim. The first, *Drug Emporium, Inc.*, 104 F.Supp.2d at 184, expressly held in its analysis of a tortious interference with prospective business relationship claim that no business relationship existed between the plaintiff healthcare provider and the insureds of the defendant insurer and that, therefore, as a matter of law, no tortious interference could have existed. The second, *Bohatiuk*, 1997 WL 34615032, at *4, also holds that the plaintiff chiropractors did not have the right to maintain and continue a relationship with the insurer's insureds. The court, however, does not specifically address who amongst the parties to that litigation had a business relationship with whom.

The court finds that the Tenth Circuit has not squarely addressed this issue. The quotation of the lower court's jury instruction in *Reazin*, without any discussion of the propriety of the same, does not establish that the Kansas courts would find a business relationship between a healthcare provider and an insured, rather than between the insured and the insurer. This court instead finds that the cases cited above are persuasive. Essentially, in the managed care industry, an insured contracts with an insurer for the insurer to pay for the insured's required medical services. The insurer fulfills its contract with the insured by compensating healthcare providers to provide healthcare services to the insured.

In addition, regardless of the holdings of the myriad cases identified above, the court finds that Heartland has failed to set forth the facts necessary to establish that it indeed has a business relationship with insureds. In its analysis, Heartland does no more than show that one of Aetna's customers asked for Heartland to be added to Aetna's network. Heartland makes no argument showing how this fact establishes that Heartland has or could have a business relationship with the insured. Heartland does not even address how it has satisfied this element of its tortious interference claim against Coventry, but simply alleges that its claim survives for the same reasons as its claim against Aetna. (*See* Doc. 899 at 60 (stating that the court should deny Coventry's motion for summary judgment on Heartland's tortious interference claim for the

same reasons articulated by Heartland in Heartland's response to Aetna's motion for summary judgment).)

As a result, Heartland has failed to carry its summary judgment burden on this essential element of its claim. *See Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (stating that a defendant can satisfy its summary judgment obligation simply by pointing out the absence of evidence on an essential element of plaintiff's claim to which a plaintiff must respond by setting forth specific facts showing that there is a genuine issue for trial). Because the court finds that Heartland has not carried its burden with respect to element one, Aetna and Coventry's motions for summary judgment on Heartland's tortious interference claim are GRANTED.

## C. Civil Conspiracy

To prove a claim for civil conspiracy under Kansas law, a plaintiff must prove:

(1) two or more persons;

(2) an object to be accomplished;

(3) a meeting of the minds in the object or course of action;

(4) one or more unlawful overt acts; and

(5) damages as the proximate result thereof.

*Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153, 161 (Kan.1984). "Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy." *Id.* The unlawful act may be an actionable violation of a Kansas statute or an actionable tort independent of the conspiracy. *Id.; see also Knight v. Neodesha, Kan., Police Dep't*, 5 Kan.App.2d 472, 476, 620 P.2d 837, 843 (Kan.Ct.App.1980) ("[A]n allegation of conspiracy does not in and of itself allege a cause of action ... an allegation of conspiracy does not warrant a

recovery, if there is no right of action independent of the conspiracy." (quoting *Nardyz v. Fulton Fire Ins. Co.*, 151 Kan. 907, 911, 101 P.2d 1045, 1048 (Kan.1940))).

Aetna and Coventry's motions for summary judgment on Heartland's civil conspiracy claims are solely premised on their arguments for the failure of Heartland's antitrust claim and tortious interference claim. (Docs. 778 at 30; 852 at 28.) Because this court has found that Heartland's antitrust claim may proceed, Aetna and Coventry's motions for summary judgment on Heartland's civil conspiracy claim are DENIED.

## VI. CONCLUSION

Aetna's motion for summary judgment (Doc. 777) is DENIED in part and GRANTED in part for the reasons stated more fully herein.

Coventry's motion for summary judgment (Doc. 848) is DENIED in part and GRANTED in part for the reasons stated more fully herein.

The Hospital Defendant's joint motion for partial summary judgment (Doc. 834) is DENIED in part and GRANTED in part for the reasons stated more fully herein.

Heartland's motion to strike (Doc. 897) and for sanctions is DENIED for the reasons stated more fully herein. Saint Luke's motion to substitute exhibit (Doc. 912) is GRANTED.

Per the procedure outlined by the court in a prior status conference (*see* Doc. 783 at 5), this order is filed under seal. Within ten days of the date of this order, any affected party (or former party) may file a brief with this court pointing to discrete portions of the order that the party believes should remain sealed. These briefs shall be limited to fifteen double-spaced pages per party and no responses shall be

filed. The Court will then determine which portions of the order, if any, will be permitted to remain sealed.

For the present time, the portions of the record that the order relates to (*i.e.*, the motions, memorandum, responses, replies, and exhibits) shall remain sealed.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. *Comeau v. Rupp*, 810 F.Supp. 1172 (D.Kan.1992). Any such motion shall not exceed five double-spaced pages and the response to any motion for reconsideration shall not exceed five double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.